**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 29 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

KENNETH WAYNE PAXTON,

     Petitioner-Appellee/
     Cross-Appellant,

v.

RON WARD,

     Respondent-Appellant/
     Cross-Appellee.

No. 98-6236, 98-6238

---

Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. CIV-96-1042-A)

---

Sandra D. Howard, Assistant Attorney General, Chief, Criminal Appeals (W.A. Drew Edmondson, Attorney General of Oklahoma, with her on the brief), Oklahoma City, Oklahoma, for Respondent-Appellant/Cross-Appellee.

Robert A. Nance of Riggs, Abney, Neal, Turpen, Orbison & Lewis, Oklahoma City, Oklahoma (Gloyd L. McCoy, of Coyle & McCoy, Oklahoma City, Oklahoma, with him on the brief), for Petitioner-Appellee/Cross-Appellant.

---

Before **SEYMOUR**, Chief Judge, **TACHA** and **KELLY**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

Petitioner Kenneth Wayne Paxton was convicted of first degree murder by a jury in Oklahoma state court and sentenced to death. After he unsuccessfully brought a direct appeal and petitions for state post-conviction relief, he filed a writ of habeas corpus in federal district court pursuant to 28 U.S.C. § 2254 asserting that numerous constitutional errors occurred during both his trial and his sentencing proceeding. The district court upheld Mr. Paxton's conviction, but determined that the sentencing proceeding was constitutionally flawed by the exclusion of mitigating evidence, the admission of hearsay evidence, and prosecutorial misconduct. Accordingly, the court granted a conditional writ, and allowed the state to elect whether to hold a new sentencing trial or to resentence Mr. Paxton in accordance with state law.

Both parties appeal. The state contends that in holding the death penalty invalid, the district court failed to properly apply the relevant provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996) (codified in relevant part at 28 U.S.C. § 2254), and failed to defer to the state court's interpretation of its own law. The state also asserts that the district court abused its discretion in fashioning the remedy. Mr. Paxton argues that he was improperly denied an instruction on a lesser included offense, and that evidence of an invalid prior conviction was improperly admitted during

the sentencing phase of his trial to support two of the three aggravating circumstances found by the jury.[1]

We agree with the district court's decision to uphold Mr. Paxton's conviction. We also agree that Mr. Paxton's death sentence is constitutionally infirm and that he is therefore entitled to habeas corpus relief. Finally, we hold that the district court did not abuse its discretion in remanding the matter to state court for further sentencing proceedings.

## I. Background

Prior to the crime, Mr. Paxton and the victim, Donna Kay Neal, maintained a relationship that had at one point been intimate. Donna used cocaine, and Mr. Paxton sometimes handled her money for her and occasionally gave her additional money when she needed it. The night of the crime, Donna and her sister Linda Neal played bingo and then went to Donna's house, where they drank beer. They later went to the house of Edward Peters, where they all smoked cocaine. They purchased more cocaine several times during the late evening and early morning hours.

---

[1] We grant Mr. Paxton's motion for a Certificate of Appealability on these claims.

After they had spent all the money they had with them, the sisters drove to Mr. Paxton's house to borrow more. While her sister waited in the car, Donna went into the house and came back with twenty dollars. They returned to Mr. Peters' house and Mr. Peters bought more cocaine. As they sat smoking it and talking, Donna looked out the window repeatedly and said she had seen Mr. Paxton's car. When someone knocked on the door, Donna thought it was Mr. Paxton and went to the door to open it.

The trial testimony as to the events that followed is in conflict. Linda Neal testified that Donna did not have a weapon with her, and that Mr. Paxton had a gun and shot Donna after she opened the door. Mr. Peters also testified that Donna was unarmed, and that after she opened the door Mr. Paxton hit her in the face. Mr. Peters testified he told Mr. Paxton to go outside, whereupon Mr. Paxton pulled a gun from his coveralls and began shooting. Mr. Paxton, on the other hand, testified that Donna took him by the hand and led him into the house, kicked him in the thigh and in the crotch, and struck at him with a knife. He stated that he then pulled out the gun to protect himself and fired toward the doorway.

After Mr. Paxton began shooting, Linda ran out the front door and Mr. Peters ran into the bathroom. Mr. Peters testified that Mr. Paxton followed him, pushed the bathroom door open, pointed the gun at his head and fired, hitting him

in the neck. After he recovered consciousness, he went out and saw Donna lying on the floor. He did not see a knife lying beside her. Mr. Peters testified that he ran outside and was pounding on the doors of neighboring houses when he saw Mr. Paxton's car return. He saw the driver get out and walk toward his house, and then saw the driver come out and head back toward the car. Mr. Paxton testified to the contrary, stating that Mr. Peters had a gun and had tried to shoot him but the gun misfired, and that he shot back in self-defense. He denied returning to the house after initially driving away.

Linda Neal testified that after Mr. Paxton began shooting, she ran out the front door past the body of her sister and tried to get into the passenger side of her car. She noticed no knife lying on the floor by her sister. As she tried to get her car door open she saw Mr. Paxton standing by the front door, and she thought he was reloading his gun. He chased her around her car and then rested the gun on the hood and shot at her. She heard the bullet go past her head and ran to a filling station, where she called the police. Mr. Paxton denied chasing Linda Neal or shooting at her, stating that he only got into his car and left.

When the police arrived at Mr. Peters' house, they found Donna Neal lying dead inside. A knife was lying by her left hand and she had a small cut on her left palm. She had been shot in the back of the head, and also had bruises and scratches to her mouth and nose.

Mr. Paxton was tried on charges of first degree murder in the death of Donna Neal, shooting with intent to kill Mr. Peters, discharging a firearm with intent to kill Linda Neal, and possession of a loaded firearm. In addition to giving an instruction on first degree murder, the trial court instructed the jury on the lesser included offense of first degree manslaughter and on Mr. Paxton's claim of self-defense. The jury convicted Mr. Paxton of first degree murder as well as the other three counts.

At sentencing, the state sought the death penalty on the basis of three aggravating circumstances, arguing that Mr. Paxton had previously been convicted of a felony involving the use of violence, that he knowingly created a great risk of death to more than one person, and that he would constitute a continuing threat to society. In addition to the evidence introduced during the guilt phase of the trial, the state offered in support of these aggravating circumstances evidence that Mr. Paxton had been convicted of first degree manslaughter in 1965, and that he had been charged in the 1979 shooting death of his wife. Over the objection of Mr. Paxton, the trial court concluded that hearsay statements made by Mr. Paxton's then-three-year-old daughter, Pamela, implicating him in her mother's death were admissible as excited utterances.

Mr. Paxton's 1979 prosecution for the shooting of his wife had been dismissed upon the state's motion. The court order in that case recited the state's

assertion that dismissal would best meet the ends of justice because Mr. Paxton had been cleared by a polygraph test. Although the jury was presented with a stipulation that the proceeding had been dismissed, the trial court did not allow the defense to tell the jury the reason for the dismissal, citing state law forbidding admission of polygraph results in any circumstances. In closing argument at Mr. Paxton's capital sentencing proceeding, the prosecutor addressed the dismissal and argued to the jury that the defense could have put on evidence, if it had any, to show that Mr. Paxton had not shot his wife. The prosecutor further asserted that the reason for the dismissal was unknown and implied it might have occurred because Pamela was afraid to testify against her father. The jury found all three aggravating circumstances established and fixed Mr. Paxton's punishment at death.

Mr. Paxton filed a direct criminal appeal contending, inter alia, that the trial court erred in refusing to give his requested instruction on second degree murder, in allowing the admission of Pamela's statements as excited utterances, and in refusing to allow admission of the results of the polygraph. Mr. Paxton also contended that the prosecutor's closing argument regarding the dismissal of the 1979 prosecution rendered his sentencing proceeding fundamentally unfair. The state court of criminal appeals affirmed his conviction and sentence. *See Paxton v. State*, 867 P.2d 1309 (Okla. Crim. App. 1993).

Mr. Paxton then filed a petition for state post-conviction relief, seeking to appeal out of time his 1965 manslaughter conviction on the ground that he was denied the effective assistance of appellate counsel. The state court held that Mr. Paxton had waited too long to make this claim and that consideration of the issue was therefore barred by laches. *See Paxton v. State*, 903 P.2d 325 (Okla. Crim. App. 1995). Mr. Paxton thereafter filed another application for state post-conviction relief challenging his capital murder conviction and sentence, again raising, among other issues, the invalidity of his 1965 manslaughter conviction. The state appellate court concluded that Mr. Paxton had waived this issue by failing to raise it on direct review, *see Paxton v. State*, 910 P.2d 1059, 1062 & n.3 (Okla. Crim. App. 1996), and affirmed the denial of relief.

## II. AEDPA

Mr. Paxton filed his petition for federal habeas corpus relief on December 20, 1996. This court has held that the provisions of the AEDPA apply to cases filed after its April 24, 1996, effective date even when the challenged state court proceedings took place before that date. *See Moore v. Gibson*, Nos. 98-6004, 98-6010, 1999 WL 765893, at *7 (10th Cir. Sept. 28, 1999) (citing *Rogers v. Gibson*, 173 F.3d 1278, 1282 n.1 (10th Cir. 1999), *petition for cert. filed* (U.S. Nov. 5, 1999) (No. 99-6954)). Accordingly, we apply the AEDPA here.

Our review of a federal district court's ruling on a request for habeas corpus relief depends on whether the claim was decided on the merits in state court. "If the claim was not heard on the merits by the state courts, and the federal district court made its own determination in the first instance, we review the district court's conclusions of law de novo and its findings of fact, if any, for clear error." *LaFevers v. Gibson*, 182 F.3d 705, 711 (10th Cir. 1999). If, on the other hand, the state courts adjudicated the merits, a petitioner is not entitled to relief unless the state court ruling "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id*. § 2254(d)(2).

The above-quoted language from section 2254(d)(1), which conditions the availability of habeas relief on a determination that a state court adjudication is "contrary to" or an "unreasonable application of" federal law, has generated various interpretations and is currently under certiorari review by the United States Supreme Court. *See Williams v. Taylor*, 163 F.3d 860 (4th Cir. 1998), *cert. granted*, 119 S. Ct. 1355 (1999) (No. 98-8384); *Moore,* 1999 WL 765893, at *8. Here as in *Moore*, however, we need not define the standards of review embodied

in section 2254(d)(1) because the outcome of this appeal would be the same under any possible interpretation of the language at issue.

### III. Lesser Included Offense Instruction

We turn first to Mr. Paxton's contention that his conviction and death sentence are invalid because the trial court denied his request for a jury instruction on the lesser included offense of second degree murder. Mr. Paxton argues that in rejecting this claim, the state courts improperly usurped the function of the jury by weighing conflicting evidence rather than assessing whether the evidence, even though disputed, could have supported a finding of second degree murder. In support of his claim Mr. Paxton relies on *Beck v. Alabama*, 447 U.S. 625 (1980), in which the Supreme Court held that "a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." *Id.* at 627.

*Beck*, however, is distinguishable. Under the statutory scheme at issue in that case, the trial judge was prohibited from instructing the jury on any lesser included offense. *See id.* at 628 & n.3. Instead, the jury was given the choice of either convicting the defendant of a capital offense, which mandated imposition

of the death penalty, or acquitting him of any criminal liability. *See id.* at 628-29. The Court stated that "the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id.* at 637. Accordingly, the Court held that the resulting level of uncertainty and unreliability in the fact finding process was constitutionally intolerable in a capital case. *See id.* at 643.

The Court revisited the issue in *Schad v. Arizona*, 501 U.S. 624 (1991). There the trial court refused to give an instruction on one lesser included offense but had instructed on another, giving the jury the choice of returning a verdict of capital murder, second-degree murder, or not guilty. The defendant argued that the "due process principles underlying *Beck* require that the jury in a capital case be instructed on every lesser included non-capital offense supported by the evidence . . . ." *Id.* at 646. The Supreme Court disagreed, holding instead that the diminished reliability of the verdict in *Beck* caused by the "all-or-nothing" nature of the decision presented to the jury is not implicated when the jury is given a third option by way of one lesser included offense instruction. *See id.* at 646-48. Accordingly, the Court held that a defendant is not constitutionally entitled "to instructions on all offenses that are lesser than, and included within, a capital offense as charged." *Id.* at 627. We have followed *Schad*, reiterating that the *Beck* requirement is "satisfied so long as the jury had the option of at least one

-11-

lesser included offense which was supported by the evidence." *Hooks v. Ward*, 184 F.3d 1206, 1225 (10th Cir. 1999).

In the case before us, the trial court instructed the jury on the lesser included offense of first degree manslaughter. Under *Schad* and *Hooks*, this instruction was sufficient to satisfy the constitutional concerns at issue in *Beck*. Mr. Paxton is not entitled to habeas relief on this claim.

### IV. Use of Prior Conviction at Sentencing

Mr. Paxton asserts that his sentencing was rendered unreliable by the use of his 1965 manslaughter conviction to support two of the aggravating circumstances upon which the state sought the death penalty. Citing *Penson v. Ohio*, 488 U.S. 75 (1988), he contends that the 1965 conviction is invalid because his appellate counsel in that case did not file a brief, thus constructively denying him an appeal and triggering a presumption of prejudice. The state asserts that Mr. Paxton's challenge to the use of this conviction in his sentencing proceeding is procedurally barred by Mr. Paxton's failure to raise it in the direct appeal of his capital case.

Our review of this issue is complicated by the fact that the parties, the state courts, and the federal district court all failed to address the fact that Mr. Paxton had presented two separate but related post-conviction proceedings. As set out

above, Mr. Paxton filed an application for post-conviction relief challenging the validity of the 1965 conviction, which the state court ruled was barred by laches. *See Paxton*, 903 P.2d at 327-28. Mr. Paxton subsequently filed another application in which he challenged the use of the 1965 conviction to support his capital sentence. The court ruled that the claim was waived by Mr. Paxton's failure to raise it in the direct appeal of his murder conviction and death sentence. *See Paxton*, 910 P.2d at 1062 & n.3. The court also rejected Mr. Paxton's claim that his appellate counsel was ineffective in failing to raise the issue on direct appeal. *Id.* at 1062-63.[2]

In his federal habeas petition, Mr. Paxton again asserted that his appellate counsel was ineffective in failing to challenge the validity of his 1965 conviction on direct appeal. However, this petition addressed only the merits of the first post-conviction decision barring the challenge under laches. Mr. Paxton did not refer to the state court ruling that the challenge to the use of his 1965 conviction in sentencing was waived by counsel's failure to raise it on direct appeal. The state responded that the challenge was procedurally barred, relying exclusively on

---

[2] We note that appeals in both post-conviction proceedings were before the Court of Criminal Appeals at the same time. Indeed, Mr. Paxton's counsel requested that the second proceeding be held in abeyance until the first appeal was decided. The decision applying laches and upholding the 1965 conviction was handed down while the second appeal was under consideration. Neither appellate decision refers to the other.

-13-

the second post-conviction ruling. The federal district court, on the other hand, determined that the state court's first habeas decision barring the claim on the basis of laches was not "an unreasonable determination of the facts" or "contrary to clearly established federal law." The court did not address the state's argument that the claim was procedurally barred by Mr. Paxton's failure to raise it on direct appeal, but instead held that Mr. Paxton's appellate counsel was not ineffective for failing to raise the matter on direct appeal.

We agree with the state's position that the waiver holding raises a procedural bar to our consideration of Mr. Paxton's challenge to the use of the 1965 conviction in his capital sentencing. Mr. Paxton does not argue to this court that the state waiver rule barring an issue not raised on direct appeal is not an adequate and independent state ground. Accordingly, we may not hear this defaulted claim unless Mr. Paxton establishes cause for the default and actual prejudice, or a fundamental miscarriage of justice. *See Jackson v. Shanks*, 143 F.3d 1313, 1317 (10th Cir. 1998), *cert. denied* 119 S. Ct. 378 (1998). Mr. Paxton does not assert on appeal that his capital appellate counsel was ineffective for failing to raise the issue on direct appeal, nor does he argue that the default will result in a fundamental miscarriage of justice. Indeed he simply does not address the waiver holding in the second state post-conviction proceeding, focusing his argument instead on the first post-conviction proceeding, which applied laches.

-14-

We therefore conclude we are procedurally barred from considering Mr. Paxton's challenge to the use of the 1965 conviction in his capital sentencing.

Moreover, even if Mr. Paxton's challenge to the validity of the 1965 conviction were properly before us, we agree with the district court that we cannot grant habeas relief with respect to the first state court decision applying laches. Under the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits[3] in state court unless the resulting decision is "contrary to" or involved "an unreasonable application of clearly established federal law" as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). The Supreme Court has expressly left open the issue of whether a state is constitutionally required to provide a defendant an opportunity to collaterally challenge a prior conviction once it is used for sentencing enhancement purposes. *See Parke v. Raley*, 506 U.S. 20, 28 (1992).[4] We therefore cannot say that the state court decision applying laches to Mr. Paxton's challenge to his 1965

_____

[3] We note that dismissals on the basis of laches are considered decisions on the merits. *See, e.g., Smith v. City of Chicago*, 820 F.2d 916, 918-19 (7th Cir. 1987); *Cannon v. Loyola Univ. of Chicago*, 784 F.2d 777, 781 (7th Cir. 1986).

[4] Moreover, the circuits are split on whether a state may deny such review on the basis of pre-enhancement delay. *Compare Tredway v. Farley*, 35 F.3d 288, 293-95 (7th Cir. 1994) (per curiam) (holding initial collateral challenge to enhancement cannot be barred on basis of pre-enhancement delay); *and Smith v. Farley*, 25 F.3d 1363, 1367-68 (7th Cir. 1994) (same), *with Moore v. Roberts*, 83 F.3d 699, 701-03 (5th Cir. 1996) (failure to challenge prior conviction within statutory time limit for bringing post-conviction relief bars subsequent challenge to use of that conviction for enhancement).

conviction is contrary to clearly established federal law.[5] Accordingly, we affirm the district court's denial of habeas relief on this claim.

## V. Sentencing Errors

We turn next to the district court's decision that the sentencing proceeding was constitutionally flawed. The court's ruling was based on its conclusion that three interrelated constitutional errors occurred when the state used the 1979 shooting death of Mr. Paxton's wife Gloria as grounds for seeking the death penalty. The court held that Mr. Paxton's constitutional right to confront the witnesses against him was violated by the admission of hearsay statements of Mr. Paxton's daughter Pamela, who was three years old at the time of her mother's death and had no present recollection of the event at the time of the trial in the present case. The court further ruled that Mr. Paxton's constitutional right to present mitigating evidence was denied by the state court's exclusion of evidence that Mr. Paxton was cleared in the death of his wife by a polygraph examination.

---

[5] Under federal law as set out in Rule 9(a) of the Rules Governing Section 2254 Cases, delay is not grounds for dismissal of a petition unless the state shows that the delay has prejudiced its ability to respond. In contrast, Oklahoma law does not require a showing of prejudice for the laches doctrine to apply to a petition for state post-conviction relief. *See Paxton*, 903 P.2d at 327. This divergence between state and federal law is not of moment here in view of the fact that federal law is unsettled on whether due process requires a state to provide *any* opportunity to challenge a state conviction once it is used for enhancement purposes. *See supra* n.4.

Finally, the district court held that the prosecutor, Robert Macy, deceived the jury in closing argument by falsely stating that he did not know why the charges against Mr. Paxton had been dismissed and by inviting the jury to be suspicious of the reason for the dismissal. The court held that Mr. Macy's prosecutorial misconduct exacerbated both the erroneous admission of the hearsay and the erroneous exclusion of the polygraph test. We address each of the district court's rulings in turn.

**A. Admission of Hearsay**

We begin with Mr. Paxton's contention that the admission of Pamela's hearsay statements was constitutional error. "The Sixth Amendment's Confrontation Clause, made applicable to the States through the Fourteenth Amendment provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Ohio v. Roberts*, 448 U.S. 56, 62-63 (1980) (citations omitted). While the Confrontation Clause does not bar the admission of all hearsay, it "reflects a preference for face-to-face confrontation at trial." *Id.* at 63. The Supreme Court has struck a balance between the need to protect the integrity of the fact-finding process through cross-examination and the needs of effective law enforcement, *see id.* at 63-65, by holding that admission of a hearsay statement does not violate the Confrontation

-17-

Clause "if it bears adequate 'indicia of reliability,'" *id*. at 66. "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.*

In this case, the state trial judge allowed the admission of a hearsay statement made by Pamela on the day of her mother's death under Oklahoma's excited utterance exception to the hearsay rule. *See* Okla. Stat. tit. 12, § 2803(2) (1991). This is a firmly rooted hearsay exception. *See White v. Illinois*, 502 U.S. 346, 355 n.8 (1992); Fed. R. Evid. 803(2); 2 McCormick on Evidence § 272 (John W. Strong ed. 5th ed. 1999). On direct appeal, the Oklahoma Court of Criminal Appeals affirmed the trial court's ruling in a divided opinion. *See Paxton*, 867 P.2d at 1320-21 (majority opinion), 1331-32 (Lane, J., concurring in result but disagreeing with majority on excited utterance issue), 1332 (Chapel, J., dissenting). The federal district court disagreed, holding that the admission of Pamela's statement violated Mr. Paxton's Confrontation Clause rights because it did not fall within the excited utterance exception and lacked reliability. In addition, the court was persuaded that Mr. Macy's speculation during closing argument that the charges had been dismissed because Pamela was afraid to testify against her father made the admission of her statement highly prejudicial.

-18-

Pamela was three years old at the time of her mother's death and does not remember the event. The state introduced statements she made on the day Gloria died through the testimony of Lavern Smith, Gloria's sister. The record reveals that Gloria was shot shortly after her son left for school in the morning. Pamela was sleeping on the couch when her brother left and Gloria was upstairs in bed. After the shooting, Mr. Paxton's sister, Zuemac Dunlap, took Pamela home with her. Pamela stayed there with Mrs. Dunlap's adult daughter and others until she was picked up by Lavern Smith and taken to her home.

Ms. Smith testified that she went to Mrs. Dunlap's house around noon with her two sisters and her brother-in-law and stayed there quite some time. Mr. Dunlap was also there, as well as someone from the union where Mr. Paxton worked. Ms. Smith testified that they all discussed the shooting while at the Dunlap home and that she did not know where Pamela was when these discussions took place. Ms. Smith further testified that after she brought Pamela to her home in the mid to late afternoon, she was crying uncontrollably. Ms. Smith tried to quiet her down, talking to her and asking her why she was crying. Pamela said "my daddy went upstairs and my daddy shot my mama and my mama rolled her eyes back in her head." Trial Tr., Rec., vol. VI, at 1248.

As noted, the federal district court concluded these statements were not admissible as excited utterances and were not otherwise reliable. In so doing, the

court rejected the state court decision to the contrary as based on an unreasonable determination of the facts. On appeal, the state acknowledges that we examine *de novo* Mr. Paxton's claim that the admission of hearsay violated his constitutional right to confront the witnesses against him. *See Hatch v. Oklahoma*, 58 F.3d 1447, 1467 (10th Cir. 1995). Nonetheless, the state contends the district court erred in failing to defer to the state courts' determination that because the hearsay fell within the state's excited utterance exception, no constitutional violation occurred.

The Supreme Court has rejected the argument that a state court determination admitting hearsay under state law is dispositive of a petitioner's habeas claim that his constitutional confrontation rights were violated by the admission. *See Lee v. Illinois*, 476 U.S. 530, 539 (1986) (admissibility of hearsay evidence as a matter of state law does not resolve Confrontation Clause issue). Circuit courts have elaborated on this proposition.

> Plainly, the mere fact that a state court, in admitting evidence, tucks it into a pigeonhole which bears the label of a time-honored hearsay exception cannot be entirely dispositive. Our habeas powers are not so blunted that we pay obeisance to the symbols of justice at the expense of substance. Thus, the state court record must show a sufficient factual predicate rationally to support the affixation of the label.

*Puleio v. Vose*, 830 F.2d 1197, 1207 (1st Cir. 1987). *See also Martinez v. McCaughtry*, 951 F.2d 130, 134 (7th Cir. 1991) (to decide Confrontation Clause

issue, "we go beyond the inference of reliability, looking to the record to see if it supports admission under [the excited utterance] exception"); *Crespin v. New Mexico*, 144 F.3d 641, 648 n.4 (10th Cir. 1998) ("We are charged with examining the [hearsay] statement in its entirety in the context of the trial record and 'in light of all the surrounding circumstances,' to determine whether the state court's application of the legal test . . . is constitutionally sound.") (citation omitted), *cert. denied* 119 S. Ct. 378 (1998).

In considering a Confrontation Clause claim on habeas, therefore, we review a state court decision by assessing whether it is reasonably supported by the record and whether its legal analysis is constitutionally sound. This approach is congruent with the standards of review imposed by the AEDPA, under which we may grant habeas relief only when a state court decision on the merits involves an unreasonable application of clearly established federal law as determined by the Supreme Court, or is based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

Under Oklahoma law, hearsay is admissible as an excited utterance if the statement relates to a startling event or condition and was made while the declarant was under the stress of excitement caused by the event or condition. *See* Okla. Stat. tit. 12, § 2803(2) (1991). This is the standard recognized as the

firmly rooted hearsay exception. *See* Fed. R. Evid. 803(2); McCormick § 272, *supra*. Thus, if the evidence before the state trial court supports the applicability of this exception, Mr. Paxton's constitutional confrontation rights were not violated.

As Oklahoma law recognizes, "[t]he critical question under this exception is whether the statements by the declarant were spoken under the extreme stress of a startling event so that there was no time to fabricate." *Johnson v. State*, 665 P.2d 815, 820 (Okla. Crim. App. 1982). The Supreme Court has elaborated as follows:

> [t]he basis for the "excited utterance" exception . . . is that such statements are given under *circumstances that eliminate the possibility of fabrication, coaching, or confabulation*, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous. *See*, *e.g.*, 6 Wigmore, supra, §§ 1745-1764; 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 803(2)[01] (1988); Advisory Committee's Note on Fed. Rule Evid. 803(2), 28 U.S.C. App., p. 778.

*Idaho v. Wright*, 497 U.S. 805, 820 (1990) (emphasis added). The question, then, is whether the circumstances under which Pamela made the statement were such that the court could be assured there was no possibility that this three year old child either was coached or overheard others state or speculate that her father shot her mother.

In ruling the hearsay admissible as an excited utterance, the state trial court expressly relied on three Oklahoma cases, *Moore v. State*, 761 P.2d 866 (Okla. Crim. App. 1988), *DeVooght v. State*, 722 P.2d 705 (Okla. Crim. App. 1986), and *Newbury v. State,* 695 P.2d 531 (Okla. Crim. App. 1985) (holding admissible as excited utterance statement made by four year old after sleeping all night following the startling event). Of these cases, only *Newbury* addressed the admissibility of hearsay under Oklahoma's excited utterance exception and that case had been previously overruled.[6] *See McCalip v. State*, 778 P.2d 488, 489-90 (Okla. Crim. App. 1989) (overruling *Newbury*; listing articles describing *Newbury* as "highly questionable," "difficult to defend," "stretch[ing] the excited utterance exception beyond its logical extreme," and "result-oriented").

*McCalip*, 778 P.2d 488, addressed the admission of a hearsay statement as an excited utterance that was made by a two year old child between ten and twelve hours after the startling event. The court ruled the admission improper,

---

[6] *Moore*, 761 P.2d 866, dealt with the admission of evidence under the state of mind exception, *id.* at 870, the dying declaration exception, *id*. at 871-72, and the exception for statements of medical history made for the purpose of medical treatment, *id*. at 873. *DeVooght*, 722 P.2d 705, addressed the admission of the hearsay statements of a four-year-old child under the residual exception to the hearsay rule on the ground that the trustworthiness of the statements was borne out by their consistency and by corroborating evidence. *See id.* at 712. Thus, neither of these cases provides guidance on whether, given the facts presented, Pamela's statement falls within the recognized excited utterance exception.

pointing out the lack of evidence that the declarant was emotionally upset or excited at the time of the statement, the length of time between the event and the statement, the fact that during this time the declarant slept soundly, and, more importantly, the lack of evidence that the statement was spontaneously volunteered. *See id.* at 490. The court stated that "[t]he underlying justification for the excited utterance exception 'is that the spontaneity of the statement in relation to the exciting event gives rise to trustworthiness,'" and held that the statement at issue was not truly spontaneous because the child made it in response to his mother asking him what was wrong several hours after the startling event. *Id.* at 490 (citation omitted). The court overruled *Newbury* insofar as it was inconsistent with its holding. *See id.*

In the present case, the Oklahoma Court of Criminal Appeals recognized that *Newbury* had been overruled prior to trial but nonetheless was untroubled by the trial court's reliance on it because it had been overruled "on factual grounds only." *Paxton*, 867 P.2d at 1320. Whether a statement falls within the exception for excited utterances is, however, clearly an intensely factual inquiry. Most significantly, in affirming the trial court's admission of Pamela's statement as an excited utterance despite that court's reliance on *Newbury*, the state appellate court clearly proceeded on an unreasonable determination of the facts in light of the evidence presented at trial.

The appellate court stated that evidence introduced by the state showed "then three (3) year old Pam Paxton followed [her father] as he took a shotgun from the back seat of his car into the house, up the stairs and shot his wife as she lay in bed." *Id.* The record reflects instead that during in camera questioning, Ms. Smith stated she could not remember whether Pamela said she had seen the shooting or said someone had told her about it. *See* Trial Tr., Rec., vol. VI, at 1173. There is no other admissible evidence on this significant point. The evidence to which the state court referred was apparently hearsay proffered through a police officer who questioned Pamela two days after the shooting, asking her a series of questions about the event, all of which she responded to by nodding her head. *See id.* at 1182-83. The trial court ruled this testimony inadmissible as hearsay. *See id.* at 1304.

The state appellate court further stated that Pamela stayed at Ms. Dunlap's home for a "short time," and that she "may have been around adults who may or may not have been talking about the shooting." *Paxton*, 867 P.2d at 1320. The trial record establishes to the contrary that Pamela was at Mrs. Dunlap's home with relatives of the shooting victim for a considerable period of time during which Ms. Smith testified that they did indeed discuss the shooting. *See* Trial Tr., Rec., vol. VI, at 1251-52. Finally, the appellate court distinguished both *Newbury* and *McCalip* on the ground that in those cases the declarant had slept between the

event and the time the statement was made. *See Paxton*, 867 P.2d at 1320. Ms. Smith testified, however, that she did not remember seeing or talking to Pamela while at Mrs. Dunlap's house, *see* Trial Tr., Rec., vol. VI, at 1252, and the state presented no evidence as to what Pamela was doing during the time the adults were gathered there. The discrepancies between the record evidence and the state appellate court's recitation of the facts concern circumstances critical to the admission of the statement as an excited utterance.

In light of the state appellate court's factually incorrect description of the evidence, we cannot conclude its determination that Pamela's statement constituted an excited utterance was supported by the record. While there is no doubt that the shooting death of Pamela's mother was a startling event, several hours passed between that event and the making of the statement. The evidence does not reveal anything about Pamela's activities or state of mind during that intervening period. We simply do not know whether she was present when the shooting was discussed, what form that discussion took, what if anything she was told about it, whether she was continuously upset, or whether she fell asleep. Any number of intervening events could have occurred that would have influenced or indeed brought about the statement at issue, such as speculation by the adults that her dad had shot her mom. And while it is true that Pamela was crying when the statement was made, there is no evidence that she had been crying or was upset

during the entire period up to that time or whether something she overheard caused her to be upset. In addition, her statement was not spontaneously volunteered, but rather was offered in response to questioning from Ms. Smith. *See* Trial Tr., Rec., vol. VI, at 1173 ("I kept asking [Pamela] why she was upset.").

It is the state's burden to establish that the statement was sufficiently reliable to meet the constitutional standard. *See Wright*, 497 U.S. at 816. If the hearsay statements do not fall within a firmly rooted hearsay exception, "they are 'presumptively unreliable and inadmissible for Confrontation Clause purposes,' and 'must be excluded, at least absent a showing of particularized guarantees of trustworthiness.'" *Id.* at 818 (citations omitted). Such guarantees of trustworthiness must come from "the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief," *id.* at 820, and "must be at least as reliable as evidence admitted under a firmly rooted hearsay exception," *id.* at 821 (citations omitted).

> Thus, unless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement.

*Id.* Under this standard, we hold that on the record before us the state has not met its burden to rebut the presumption that Pamela's statement was unreliable for

Confrontation Clause purposes. The admission of her statement therefore violated Mr. Paxton's right to confront the witness and to test her statement through cross-examination.

## B. Exclusion of Mitigating Evidence

We next consider Mr. Paxton's argument that he was denied the right to present mitigating evidence. This claim arises from the trial court's refusal to admit a court order stating that Mr. Paxton had been cleared in his wife's death by a polygraph examination. In ruling the polygraph results inadmissible, the state courts relied on settled state law holding that the results of a polygraph test may not be admitted for any purpose. *See Paxton*, 867 P.2d at 1323. The federal district court concluded that in relying on this rule the state courts violated clearly established federal law, which holds that state evidentiary rules may not be used to deny a capital defendant's rights under the Eighth and Fourteenth Amendments to present mitigating evidence as a basis for a sentence less than death. On appeal, the state argues that no constitutional violation resulted from the exclusion of this evidence because the Supreme Court has recognized that polygraph results are unreliable. In so doing, the state relies on a Supreme Court

case not relevant to a capital sentencing proceeding and disregards or attempts to distinguish controlling cases.[7]

During the sentencing proceeding, the bulk of the state's evidence was directed to the circumstances surrounding the death of Gloria Paxton. In addition to presenting Lavern Smith's testimony on Pamela's hearsay statements, the state presented testimony from Gloria's son describing events on the day of the shooting, testimony from the medical examiner who had examined Gloria's body and who described the shotgun wound, testimony from the police officer who had gathered evidence at the scene and taken pictures of Gloria's body, the pictures themselves, testimony from a ballistics expert who examined the shotgun that

---

[7] The state appellate court also concluded that the Supreme Court authority relied on by Mr. Paxton and cited by the federal district court was distinguishable because here "[t]he court's ruling did not prevent [Mr. Paxton] from presenting other evidence concerning the dismissal of the prior charge, such as the testimony of the polygraph examiner or any of the attorneys involved in the dismissal." *Paxton*, 867 P.2d at 1324. We reject this contention out of hand as contrary to the trial record. In refusing to admit the order dismissing the criminal proceedings against Mr. Paxton, the trial court stated:

> It is clear to this Court that the results of a polygraph test is [sic] not admissible for any purpose. . . .[T]he credibility of the evidence in this case must not be determined by the admissibility of the results of the polygraph test . . . and the Court excludes and directs all the witnesses and the attorneys and the parties to refrain from making any statements or references in the presence of the jury that, quote, defendant cleared by polygraph test, close quote.

Trial Tr., Rec., vol. VI, at 1356-57. This emphatic and unambiguous ruling did not leave Mr. Paxton's defense the option of introducing the test results through the polygraph examiner, the attorneys involved, or indeed from any other source whatsoever.

killed Gloria and stated his opinion that it would not have discharged accidentally,[8] and testimony from a homicide detective who did the follow up investigation of the shooting and who testified that after his reports were turned over to the district attorney's office, the case was dismissed.

In order to counter the possibility that the jury would conclude from this evidence that Mr. Paxton had deliberately killed Gloria with a shotgun, defense counsel sought to admit an order entered by a state court judge dismissing the prosecution of Mr. Paxton for the shooting at the request of the then-district attorney. The order itself recited that the district attorney moved the court to dismiss the proceeding "for the following reasons, to wit: TO BEST MEET THE ENDS OF JUSTICE. . . DEFENDANT CLEARED BY POLYGRAPH TEST." Def's. Ex. 5 (admitted during in camera proceedings, *see* Trial Tr., Rec., vol. VI, at 1357). The state objected to the language stating that Mr. Paxton had been cleared by a polygraph test. The trial judge sustained the objection and directed all parties to refrain from referring to the polygraph results. *See supra* note 7. Thereafter the parties stipulated to the fact that after review of the investigation into Gloria's death, criminal proceedings against Mr. Paxton were dismissed at the request of the district attorney.

---

[8] On cross examination, the expert also testified that tests administered to Mr. Paxton's hands revealed no trace of gunshot residue.

In closing argument on behalf of the state, Mr. Macy made the following

remarks:

> I'll tell you what, ladies and gentlemen, he had the same opportunity
> to put evidence on that witness stand about that killing that we did.
> Everything – if he had any evidence – if the defense had any
> evidence to show that that crime didn't happen exactly the way that
> our witnesses told you it did he could have put a witness on the
> witness stand. You didn't hear from anybody.
> . . . And there could be a lot of reasons as to why it [was
> dismissed] – one of them may have been the fact that Pam Paxton
> wouldn't talk about it and she was the only eyewitness that witnessed
> it and who knows. We don't know why it was dismissed.

Trial Tr., Rec., vol. VI, at 1392. In so doing, Mr. Macy clearly and deliberately

made two critical misrepresentations to the jury: he told the jury that Mr. Paxton

had been given the opportunity to present any evidence showing that he had not

killed his wife, and he told the jury that the reason for the dismissal was

unknown. In fact, as Mr. Macy well knew, his objections had prevented Mr.

Paxton from presenting evidence that he had passed a polygraph test in

connection with the shooting, and that those test results were the reason for the

dismissal. It is against this factual background that we assess whether Mr.

Paxton's inability to present mitigating evidence rendered his sentencing

proceeding constitutionally invalid.

In *Skipper v. South Carolina*, 476 U.S. 1 (1986), the defendant was

prevented during the sentencing phase of his capital trial from presenting

disinterested witnesses who would have testified he had made a good adjustment

-31-

to jail during his pretrial incarceration. The state trial judge ruled that this evidence was irrelevant under state law and therefore inadmissible. The prosecutor in closing argument contended the defendant would be a discipline problem in prison and would likely rape other prisoners. The defendant argued on appeal that evidence of his good behavior in jail was both relevant and mitigating and that its exclusion was constitutional error under *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

The Supreme Court agreed and reversed the death penalty, reiterating its holding in *Lockett* and *Eddings.*

> There is no disputing that this Court's decision in *Eddings* requires that in capital cases "'the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'"

*Skipper*, 476 U.S. at 4 (quoting *Eddings*, 455 U.S. at 110 (quoting *Lockett*, 438 U.S. at 604)) (emphasis in original). Accordingly, the Court held that the defendant was deprived of his right to place relevant evidence in mitigation before the jury. *See id.* at 8. The Court noted that the relevance of the evidence was underscored in that case

> by the prosecutor's closing argument, which urged the jury to return a sentence of death in part because petitioner could not be trusted to behave if he were simply returned to prison. Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule of *Lockett* and *Eddings* that requires that the defendant be afforded an opportunity to

-32-

introduce evidence on this point; it is also the elemental due process requirement that a defendant not be sentenced to death "on the basis of information which he had no opportunity to deny or explain."

*Id*. at 5 n.1 (quoting *Gardner v. Florida*, 430 U.S. 349, 362 (1977)). The concurrence in *Skipper* agreed with the result reached by the majority but would have reversed on the ground that the defendant was not allowed to rebut evidence and argument used against him, citing *Gardner*. *See id*. at 9 (Powell, J. concurring). As did the majority, the concurrence pointed out that the constitutional error was aggravated by the prosecutor's closing argument, which emphasized the very evidence the excluded testimony would have rebutted. *See id.* at 11. Significant for our purposes here, the Court held that the prosecutor's argument both underscored the relevance of the evidence and aggravated the error arising from its exclusion, and found reversible error notwithstanding the fact that the excluded evidence was inadmissible under state law.

Also relevant to our inquiry is the Supreme Court's treatment in *Green v. Georgia*, 442 U.S. 95 (1979) (per curiam), of facts analogous to those before us. There the trial court had denied the introduction of evidence that was inadmissible hearsay under state law. Citing *Lockett*, the Court held the exclusion constitutional error, stating that "[r]egardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment"

because it "was highly relevant to a critical issue in the punishment phase of the trial." *Id.* at 97. Moreover, in holding the evidence sufficiently reliable despite its hearsay status, the Court pointed out that "the State considered the testimony sufficiently reliable to use it against [a codefendant], and to base a sentence of death upon it." *Id.* Accordingly, the Court held that in such circumstances "'the hearsay rule may not be applied mechanistically to defeat the ends of justice.'" *Id.* (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). Here, as in *Green,* the excluded evidence was highly relevant to punishment, and the state had considered it sufficiently reliable to warrant the dismissal of the earlier charges against Mr. Paxton.

Finally, in *Rock v. Arkansas*, 483 U.S. 44 (1987), the Supreme Court addressed the applicability of state evidentiary rules when they interfere with a defendant's constitutional right to testify in his own defense. At issue there was a per se rule excluding a witness' hypnotically refreshed testimony. The Court held that application of a state per se rule of inadmissibility designed to ensure reliable testimony "does not extend to *per se* exclusions that may be reliable in an individual case. Wholesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections." *Id.* at 61. The Court ruled the exclusion there infringed on the defendant's right to testify,

-34-

pointing out that the challenged testimony was corroborated by other evidence. *See id.* at 62. In the instant case, the reliability of the excluded polygraph test was corroborated by the fact that the state relied upon it in dismissing the earlier charges against Mr. Paxton.

This Supreme Court authority makes clear that a state court may not apply a state rule of evidence in a per se or mechanistic manner so as to infringe upon a defendant's constitutional right to a fundamentally fair trial and to present mitigating evidence in a capital proceeding. Indeed this court and others have viewed the above cases as controlling on the issue in similar circumstances. In *Dutton v. Brown*, 812 F.2d 593 (10th Cir. 1987), for example, after reviewing the holdings in *Lockett*, *Eddings*, *Green*, and *Skipper*, we held that constitutional error occurred when mitigating evidence was excluded in the sentencing phase of a capital case on the basis of a state witness sequestration rule. We pointed out that "[t]he Supreme Court has been exceedingly cautious to ensure that a person found guilty of a capital offense is given every opportunity to present potentially mitigating evidence that might form the basis for a sentence less than death." *Id*. at 602. *See also Gonzales v. Lytle*, 167 F.3d 1318 (10th Cir. 1999) (admission of witness' inculpatory statements and exclusion of exculpatory recantation rendered trial fundamentally unfair and required grant of habeas relief).

The Ninth Circuit has also held under very similar circumstances that the exclusion of polygraph evidence under state evidence rules violated a defendant's right to present relevant mitigating evidence in a capital case. *See Rupe v. Wood*, 93 F.3d 1434, 1439-41 (9th Cir. 1996). There the state courts, citing *Lockett*, had recognized that "under controlling United States Supreme Court authority, relaxed standards govern the admission of mitigating evidence during the penalty phase of a death penalty trial." *Id.* at 1439. Nonetheless the state court summarily affirmed the exclusion of polygraph evidence as unreliable. The Ninth Circuit affirmed the grant of habeas corpus relief, holding that the refusal to admit the polygraph evidence at sentencing "violated the principle of *Lockett* and *Eddings* by interfering with the jury's ability to weigh the mitigating factors." *Id.* at 1440. In holding the polygraph results relevant, the court pointed out that the evidence not only bore on the defendant's role in the crimes, it was also relevant to the state's case because it would have refuted assertions made by the prosecutor in closing argument. *See id.* at 1441.

Notwithstanding the compelling authority discussed above, the state argues on appeal that no constitutional violation occurred here, relying heavily on *United States v. Scheffer*, 523 U.S. 303 (1998). There the defendant in a court-martial proceeding sought admission of polygraph results to support his testimony that he had not knowingly used drugs. The military judge excluded the results in reliance

upon a military rule of evidence making polygraph evidence inadmissible. The Supreme Court held that application of the rule did not abridge the defendant's right to present a defense. *Scheffer* is distinguishable in at least one dispositive respect: it did not involve a capital defendant's constitutional right to present mitigating evidence. Indeed the Court there was careful to distinguish its facts from those in which the exclusion of evidence "has infringed upon a weighty interest of the accused," *id.* at 308, or "implicate[s] a sufficiently weighty interest of the defendant to raise a constitutional concern under our precedents," *id.* at 309.

The Court pointed out that state evidentiary rules "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Id.* at 308 (citing *Rock*). Significantly, the Court specifically distinguished *Rock*, which involved a state evidentiary rule that infringed on the right to testify on one's own behalf; *Chambers*, 410 U.S. 284, which involved state evidentiary rules that infringed on the right to present witnesses in one's own defense and to confront and cross-examine the witnesses; and *Washington v. Texas*, 388 U.S. 14 (1967), which involved a state evidentiary rule that denied the right to compulsory process for obtaining favorable witnesses. *See id.* at 316. After pointing out that "[t]he exclusions of evidence that we declared unconstitutional in those cases

significantly undermined fundamental elements of the defendant's defense," *id.* at 315, the Court upheld the evidentiary rule barring the admission of polygraph results because as applied in the case before it the rule "did not implicate any significant interest of the accused," *id.* at 316-17, or significantly impair the defense, *id*. at 317.[9]

Here, the mechanistic application of a per se evidentiary rule operated to exclude evidence that proceedings against Mr. Paxton in the death of his wife were dismissed because *in the district attorney's view* he had been cleared by a polygraph examination. Under our view of controlling Supreme Court authority, this exclusion denied Mr. Paxton his right to present mitigating evidence as a basis for a sentence less than death. Moreover, in view of the prosecutor's mendacious closing argument that Mr. Paxton had failed to refute the state's version of his wife's death, that the reason for the dismissal of charges against him was unknown, and implying that his daughter had not testified against him

---

[9] The Court also pointed out that unlike the circumstances in *Rock*, *Washington*, and *Chambers*, the evidentiary rule as applied in *Scheffer* did not prevent the defendant from presenting the relevant details of the defense from the defendant's prospective. *See Scheffer*, 523 U.S. at 317. Here, to the contrary, application of the per se rule barring polygraph results prevented Mr. Paxton from telling the jury the reason why the prior criminal proceedings had been dismissed, thus significantly impairing his ability to defend against the death penalty. As we discuss *infra* in text, the effect on Mr. Paxton's defense was exacerbated by Mr. Macy's closing argument misrepresenting the circumstances of the dismissal and inviting the jury to speculate as to the reason.

out of fear, Mr. Paxton was denied his due process right to explain or deny the evidence against him. Because *Scheffer* specifically limited its holding to cases in which exclusion did not undermine the accused's defense or implicate other significant interests, it is inapposite here. We thus conclude that the state court decision affirming Mr. Paxton's death penalty despite the exclusion is contrary to clearly established federal law as determined by the Supreme Court.

## C. Prosecutorial Misconduct

Finally, we address directly Mr. Paxton's claim that Mr. Macy's closing argument resulted in constitutional error requiring habeas relief. As we have mentioned, the state presented copious evidence on the circumstances surrounding the shooting of Gloria Paxton from which the jury would likely infer that Mr. Paxton was responsible for her death. In addition, the state successfully prevented Mr. Paxton from telling the jury that the former district attorney had dismissed the case upon concluding that Mr. Paxton had been cleared by polygraph results. In closing argument, Mr. Macy took advantage of Mr. Paxton's inability to present the reason for the dismissal, deceitfully telling the jury that Mr. Paxton had failed to avail himself of the opportunity to counter the state's case and inviting the jury to draw an adverse inference from that failure.

> I'll tell you what, ladies and gentlemen, he had the same opportunity
> to put evidence on that witness stand about that killing that we did. .

-39-

. . [I]f the defense had any evidence to show that that crime didn't happen exactly the way that our witnesses told you it did he could have put a witness on the witness stand. You didn't hear from anybody.

Trial Tr., Rec., vol. VI, at 1392.

Mr. Macy then invited the jury to speculate on the reasons for the dismissal, implying that it was somehow improper or that it was because Pamela was afraid or reluctant to testify against her father:

> Andy Coats [the former district attorney] didn't dismiss that case. The Assistant District Attorney did named Robert Mildfelt dismissed it. We have no . . . way of knowing whether Mr. Coats even knew about it or not. And there could be a lot of reasons as to why it wasn't – one of them may have been the fact that Pam Paxton wouldn't talk about it and she was the only eyewitness that witnessed it and who knows. We don't know why it was dismissed.

*Id.*

The state court held that the above comments did not deny Mr. Paxton his constitutional right to a fair sentencing proceeding, without acknowledging the fact that the comments contained material misrepresentations designed to mislead the jury. Instead, the state appellate court held that the reference to Mr. Paxton's failure to present evidence rebutting the state's version of events was "a legitimate matter for comment during the State's argument." *Paxton*, 867 P.2d at 1330. The court likewise had no problem with Mr. Macy's statement on the reason for the dismissal, stating that "comments that 'we don't know why it (the

prior murder charge) was dismissed' were properly based upon the record as no evidence concerning the basis for the dismissal was introduced." *Id.*

The federal district court considered Mr. Macy's remarks in combination with the erroneous exclusion of the evidence that the state had dismissed the criminal proceedings on the basis of polygraph results and the erroneous admission of Pamela's hearsay statements. After holding that the exclusion of the polygraph evidence was constitutional error, the district court stated that

> the prosecution made the results to the polygraph test relevant by stating [the state] did not know why the prior charge had been dismissed and by speculating that the lack of witness testimony was based upon the daughter's fear. Although the jury was notified that the prior charge was dismissed by the State, it was simultaneously asked to be suspicious of the reason for the dismissal. This argument by the prosecution misrepresented the facts and made rebuttal necessary, but unavailable.

Rec., vol. I, doc. 29 at 36-37 (citations omitted). The district court determined that Mr. Macy's argument in this regard struck a foul blow and constituted prosecutorial misconduct.

The district court then determined that the admission of Pamela's hearsay statement was improper and prejudicial because it "had a substantial and injurious [e]ffect on the jury's determination whether [Mr. Paxton] was a continuing threat to society. More specifically, the prosecutor's speculation during closing argument that the charge was dismissed because Ms. Paxton was afraid to testify

-41-

against her father made the admission of her testimony highly prejudicial." *Id.* at 41.

On appeal, the state contends that in characterizing Mr. Macy's comments as prosecutorial misconduct, the federal district court failed to give deference to the state court's determination that the challenged remarks were proper comments on the evidence. The state also argues that the remarks were in fact not improper, and that they did not deprive Mr. Paxton of a fundamentally fair sentencing hearing in any event. These arguments misstate the inquiry and border on the specious.

We begin by rejecting summarily the state's invitation to parse the prosecutor's argument word by word in a vacuum and justify it on the ground that there was in fact no evidence in the record as to why the charge had been dismissed. The argument was clearly meant to be understood as inviting the jury to infer that Mr. Paxton had no evidence to rebut the state's assertion that he killed his wife and to speculate at Mr. Paxton's expense on the reasons for dismissal. While it may be true that Mr. Macy could not have commented on facts not in the record, rather than saying nothing he chose to misrepresent the reason for the absence of those facts.

We also disagree with the state's contention that the appropriate inquiry is whether the prosecutor's argument denied Mr. Paxton his right to a fundamentally fair sentencing proceeding under the analysis of prosecutorial misconduct set forth

-42-

in *Darden v. Wainwright*, 477 U.S. 168 (1986). "When specific guarantees of the Bill of Rights are involved, [the Supreme Court] has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Accordingly, this court has drawn an important distinction between an ordinary claim of prosecutorial misconduct, which warrants habeas relief only when the entire proceeding is rendered fundamentally unfair, and a claim that the misconduct effectively deprived the defendant of a specific constitutional right, which may be the basis for habeas relief without proof that the entire proceeding was unfair. *See Mahorney v. Wallman*, 917 F.2d 469, 472 (10th Cir. 1990); *see also Brecheen v. Reynolds*, 41 F.3d 1343, 1355 (10th Cir. 1994); *Yarrington v. Davies*, 992 F.2d 1077, 1079-80 (10th Cir. 1993).

We agree with the district court that the misconduct which undisputedly occurred here was an integral part of the deprivation of Mr. Paxton's constitutional rights to present mitigating evidence, to rebut evidence and argument used against him, and to confront and cross-examine the state's witnesses. Because Mr. Macy's remarks infringed upon specific constitutional rights, Mr. Paxton may establish his entitlement to habeas relief without showing that the comments rendered his sentencing fundamentally unfair.[10]

---

[10] We also note the Court in *Darden* indicated that prosecutorial misconduct may be grounds for habeas relief when it "manipulate[s] or misstate[s] the

(continued...)

We further conclude that Mr. Macy's comments had a substantial prejudicial effect on those rights by implying to the jury that Mr. Paxton had no evidence in mitigation, that the reason for the dismissal of the charges was suspect, and that his daughter was afraid to testify against him. These remarks cannot be characterized as an invited response, nor did the defense have any means for effectively rebutting them. *See Darden*, 477 U.S. at 182. We thus have no doubt that Mr. Macy's conduct crossed the line between a hard blow and a foul one, consequently giving rise to a valid constitutional claim.

We are mindful that we may not grant habeas relief on this claim unless the state court's ruling was contrary to or involved an unreasonable application of clearly established Supreme Court authority, or was based on an unreasonable determination of the facts in light of the evidence presented at trial. *See* 28 U.S.C. § 2254(d). In our view, both grounds of the AEDPA compel us to conclude that the state court's resolution of this claim is not entitled to deference. First, in considering whether the closing argument denied Mr. Paxton fundamental fairness, the state appellate court did not assess the remarks under the appropriate constitutional standard; indeed, the state court simply did not refer to controlling

[10](...continued)
evidence," as well as when it "implicate[s] other specific rights of the accused such as the right to counsel or the right to remain silent." 477 U.S. at 182. Fairly read in context, Mr. Macy's statements fall squarely within the category of misstatement and manipulation condemned by the Court in *Darden*.

-44-

Supreme Court authority for guidance either directly or indirectly. In our view that authority compels the conclusion that the argument here prejudicially infringed on Mr. Paxton's constitutional rights. Second, in upholding the statements as properly based on the record, the state court disregarded the fact that the statements deliberately misrepresented the reason for the record's condition. We thus conclude that the state court ruling was both contrary to governing Supreme Court authority and based on an unreasonable view of the state court proceedings.

In sum, we hold that Mr. Paxton was denied his right to confront the witnesses against him, his right to present mitigating evidence in support of a sentence less than death, and his due process rights to explain or deny the evidence against him. We further hold that the prosecutorial misconduct at issue was an integral and prejudicial part of that denial. We therefore turn to the propriety of the remedy ordered by the district court.

## VI. Habeas Remedy

The state sought the death penalty on the basis of three aggravating circumstances, asserting Mr. Paxton had been convicted of a prior violent felony, had knowingly created a great risk of death to more than one person, and would constitute a continuing threat to society. As support for its claim that Mr. Paxton would pose a continuing threat to society, the state introduced evidence concerning

the shooting death of his wife that generated the constitutional errors described above. The federal district court ruled that these errors had a substantial and injurious effect on the jury's determination that this aggravating factor supported imposition of the death penalty and granted a conditional writ requiring the state to hold a new sentencing hearing.

The state moved to alter or amend the judgment, contending the district court erred in ordering a new sentencing proceeding rather than reweighing the remaining aggravating and the mitigating evidence or allowing the state appellate court to do so. The district court denied the motion, observing that it had not struck down the aggravator itself as invalid but had only found constitutional error in the presentation of evidence to support it. Accordingly, the court pointed out that its ruling did not preclude the state from again relying on the continuing threat aggravator at resentencing so long as it did so in a constitutional manner.

On appeal, the state has apparently decided to forego the opportunity provided by the district court to pursue resentencing on the basis of all three aggravating circumstances. Instead, the state argues that the district court erred in failing to preface its grant of habeas relief with a harmless error analysis to determine whether the errors with respect to the continuing threat aggravator had a substantial and injurious effect not only on the jury's consideration of that aggravator, but on the outcome of the sentencing proceeding as a whole. The state

also argues that the district court failed to follow state law, which provides that the state appellate court may conduct a reweighing when an aggravating factor has been struck down. *See*, *e.g.*, *Stouffer v. State*, 742 P.2d 562 (Okla. Crim. App. 1987). Although these arguments are interrelated, they appear to make two separate assertions: habeas relief is not warranted because any constitutional errors were harmless; and if relief is warranted, the district court abused its discretion in formulating that relief.

In arguing on appeal that the district court erred in awarding habeas relief without first performing a harmless error analysis, the state does not address the effect of the district court's ruling that the prosecutorial misconduct here prejudiced specific constitutional rights, or Mr. Paxton's argument on appeal that he therefore need not demonstrate the entire proceeding was rendered unfair to be entitled to habeas relief. Assuming that habeas relief is nonetheless only appropriate when grave doubt exists as to whether the errors had a substantial and injurious effect on the sentencing proceeding as a whole, *see O'Neal v. McAninch*, 513 U.S. 432, 435-36 (1995), we harbor such a doubt.

The record reflects that the circumstances surrounding the shooting of Mrs. Paxton were the primary focus of the state's argument and evidence at sentencing. Indeed the proceedings can fairly be characterized as effectively putting Mr. Paxton on trial in that death. The prejudicial nature of the improperly admitted hearsay of

Mr. Paxton's daughter, the significance of the improperly excluded state court order dismissing the case against Mr. Paxton, and the aggravating role played by the prosecutorial misconduct together so permeated the proceedings that we cannot separate the effect they had on the jury's finding of the continuing threat aggravator from its decision to impose the death penalty. Because we have grave doubt as to whether the constitutional errors had a substantial and injurious effect on the sentencing jury, habeas relief is appropriate.

We next turn to the state's argument that in formulating habeas relief, the district court abused its discretion by requiring a new sentencing proceeding rather than reweighing evidence or allowing the state appellate court to do so. "In issuing a writ of habeas corpus, a federal court has the power and authority to dispose of habeas corpus matters 'as law and justice require.'" *Burton v. Johnson*, 975 F.2d 690, 693 (10th Cir. 1992) (quoting 28 U.S.C. § 2243). "The statute vests the federal courts with 'the largest power to control and direct the form of judgment to be entered in cases brought . . . on *habeas corpus*.'" *Capps v. Sullivan*, 13 F.3d 350, 352 (10th Cir. 1993) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987)). *See also Carafas v. LaVallee*, 391 U.S. 234, 239 (1968) (habeas statute's mandate is broad with respect to relief that may be granted); *Osborn v. Shillinger*, 861 F.2d 612, 630 (10th Cir. 1988).

The district court did not rule that the continuing threat aggravator was itself invalid, but rather determined that the state had not presented it to the jury in a constitutional manner. The state indicates that it does not wish to pursue that aggravator, and instead argues that either this court or the district court should reweigh the remaining aggravating circumstances against the mitigating evidence, or allow the state court to do so. This argument misperceives the nature of the constitutional errors requiring redress.

The continuing threat aggravator was featured prominently in the state's case at sentencing. Given the magnitude of the constitutional errors arising from the presentation of that aggravator, the prejudicial nature of the evidence improperly excluded and admitted, and the nature of the prosecutorial misconduct that occurred, we are not confident that the resulting prejudice can be neatly excised from the sentencing process. *See*, *e.g.*, *Stout v. State*, 817 P.2d 737, 739 (Okla. Crim. App. 1991) (remanding for new sentencing hearing in capital case).

Moreover, unlike the reweighing cases cited by the state, the sentencing process here was rendered unreliable not because the jury weighed an invalid or unsupported aggravating circumstance, but because in reaching its result the jury was denied consideration of relevant mitigating evidence, *see Skipper*, 476 U.S. at 8 (remanding for new sentencing proceeding at which petitioner could present previously excluded mitigating evidence), and was exposed to prejudicial evidence

and argument, *see Gardner*, 430 U.S. at 362 (remanding for new sentencing hearing when appellate review "could not fully correct" error in denying petitioner opportunity to rebut evidence and argument used against him).[11]  Under these circumstances, reweighing does not address the nature of the constitutional violations or fully correct the errors.  *See id.*  Accordingly, we affirm the district court's ruling that Mr. Paxton be given a new sentencing proceeding.

**AFFIRMED.**

---

[11] Indeed, in holding that reweighing was appropriate after invalidating an aggravating circumstance, the court in *Stouffer v. State*, 742 P.2d 562 (Okla. Crim. App. 1987), "note[d] specially that the jury, in evaluating the existence of [the invalid] aggravating circumstance, was not presented with any constitutionally infirm or otherwise improper evidence," *id.* at 564 (citing *Zant v. Stephens*, 462 U.S. 862 (1983), and *Barclay v. Florida*, 463 U.S. 939 (1983)).