**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARCUS D. WINZER,
       *Petitioner-Appellant,*

v.

JAMES E. HALL, Warden,
       *Respondent-Appellee.*

No. 06-55327

D.C. No.
CV 04-07301-DSF-
RZ

OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge

Argued February 8, 2007
Submitted July 13, 2007
Pasadena, California

Filed July 23, 2007

Before: Alex Kozinski and Stephen S. Trott, Circuit Judges,
and Donald W. Molloy,* District Judge.

Opinion by Judge Molloy

*The Honorable Donald W. Molloy, Chief Judge, United States District
Court for the District of Montana, sitting by designation.

**COUNSEL**

Carol K. Lysaght, Santa Monica, California, for the petitioner-appellant.

Bill Lockyer, Attorney General of the State of California; Mary Jo Graves, Chief Assistant Attorney General; Pamela C. Hamanaka, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General; Yun K. Lee, Deputy Attorney General, Los Angeles, California, for the respondent-appellee.

**OPINION**

MOLLOY, District Judge:

Appellant/Petitioner Marcus Winzer appeals from the district court's denial of his petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254. He was convicted by a Los Angeles County jury on two counts of making a terrorist threat by saying "I'll smoke you and your daughter" while appearing to indicate that he had a gun in the waistband of his pants. The statement and gesture were proved at trial through the testimony of a police officer, who interviewed the two victims at their home more than five and a half hours after Winzer left it. Based on the officer's testimony about the victims' demeanor, and despite the trial court's exclusion of their 911 call as "one of the calmest" it had ever heard, the California courts concluded that the victims' statements to the officer were spontaneous and therefore exceptions to hearsay. The mother did not appear at trial. The daughter did not recall Winzer making the threat and did not see the gesture. Winzer contends that his Sixth Amendment right to confrontation was violated.

*Crawford v. Washington*, 541 U.S. 36 (2004), does not apply because it was decided after Winzer's trial and appeal. *See Whorton v. Bockting*, ___ U.S. ___, 127 S. Ct. 1173 (2007). Even so, federal law that was clearly established before *Crawford* mandates reversal.

## I. FACTUAL BACKGROUND

Around 10:45 a.m. on December 2, 2001, Winzer and his "on-again, off-again" girlfriend, declarant Parrish Harvey, were strenuously arguing in her home. At the same time, Parrish's daughter, nineteen-year-old Mercedes Hernandez, was arguing on the phone with her boyfriend. At Parrish's insistence, Winzer left the house at about 11:00 a.m., ten or fifteen minutes after the argument started.

Later in the afternoon, having had several hours to think about the argument, Parrish called 911. At about 4:40 p.m., Los Angeles police officer Michael Dickson arrived at her house in response to her call. Based on Dickson's interview

with Parrish and Mercedes, Winzer was charged with two counts of making a terrorist threat. *See* Cal. Penal Code § 422.

At trial, the State offered the tape of Parrish's 911 call under California's "spontaneous statement" exception to hearsay. The trial court found that "it's got to be one of the calmest 911 tapes I think I have heard" and "I can't say from what I hear on the tape . . . that she is under the distress of the excitement of the event. And the bulk of it actually, the bulk of the tape is not talking about the event." Consequently, the 911 tape was excluded. But the prosecution found another way to skin the cat.

When the State offered Dickson's testimonial report of Parrish's statement, the trial court found that "the court does have to give some deference to the experienced officer who was questioning the individuals." It admitted Dickson's report of the victims' statements to him as spontaneous statements because Parrish and Mercedes appeared to Dickson to be "visibly upset, emotionally upset, almost to the point of shaking, [and] fearful," at the time he talked to them.

Parrish was in custody the day before testimony began but the State did not call her to testify.[1] The other witness, Mercedes, said she had memory problems due to a seizure disorder. She remembered several details of the incident, but she testified that she did not recall overhearing Winzer say, "I'll smoke you and your daughter." Parrish's mother, Pauline, testified that she heard Mercedes tell the prosecutor the day before trial that she remembered Winzer saying he would "have her blown away." Pauline also took the opportunity to make several unsolicited remarks to and about Winzer in front of the jury over the trial court's objections.

---

[1]There is a reference in the record suggesting that Parrish believed the district attorney threatened her or was rude to her as well as a reference to psychological medication. The record before us does not clarify the situation.

Officer Dickson then testified that *Parrish told him that Winzer said*, "I'll smoke you and your daughter," and that Mercedes told him she overheard Winzer's remark. Dickson also testified that Parrish said Winzer "made a motion with his hand toward his waistband" and that she saw something shiny in his waistband that she thought was a gun, though she did not see it clearly. There is no evidence that Mercedes or anyone else either saw the gesture or told Dickson about it. The evidence is the fulcrum of the state's case and Winzer's conviction.

Five days after making the threat, Winzer again turned up at Parrish's house and argued with her. Parrish showed officers two broken doors and two phone lines that had been pulled out of the wall, but there was no evidence to show who caused the damage. The State also introduced evidence showing that Parrish had a protective order against Winzer.

Winzer was convicted and sentenced to serve nine years in prison.

## II.  ANALYSIS

We review a district court's denial of a habeas petition de novo. *See Paradis v. Arave*, 20 F.3d 950, 953 (9th Cir. 1994). Alleged Confrontation Clause violations are also reviewed de novo. *Id*. at 956.

### A.  AEDPA Standards

The Anti-terrorism and Effective Death Penalty Act ("AEDPA") governs because Winzer filed his petition in the district court on September 1, 2004. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Barajas v. Wise*, 481 F.3d 734, 738 (9th Cir. 2007).

On the merits, and under AEDPA, Winzer may obtain relief only in one of two circumstances. First, he may obtain

relief if the state courts' denial of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "Clearly established Federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions. *See Carey v. Musladin*, ___ U.S. ___, ___, 127 S. Ct. 649, 653 (2006). A state-court decision is "contrary to" clearly established Supreme Court precedent if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state-court decision will be an "unreasonable application" of federal law "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407.

Second, Winzer may obtain relief if the state courts' decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Federal courts must presume the correctness of the state court's factual findings, but Winzer may rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Finally, a federal court sitting in habeas jurisdiction must be convinced that the state court's decision is "more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The state court's decision must be "objectively unreasonable." *Id.*

### B. Clearly Established Supreme Court Law on Hearsay Exceptions and the Confrontation Clause

In 1965, the Sixth Amendment's Confrontation Clause was recognized as a component of the Fourteenth Amendment's Due Process Clause and applied to the States. At that time, the Supreme Court noted:

There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.

*Pointer v. Texas*, 380 U.S. 400, 405 (1965). "The Confrontation Clause advances [this goal] by ensuring that convictions will not be based on the charges of unseen and unknown — and hence unchallengeable — individuals." *Lee v. Illinois*, 476 U.S. 530, 540 (1986).

**[1]** The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. am. VI. Read literally, the Clause would amount to a blanket prohibition on all hearsay testimony. It has never been construed so broadly. But when the prosecution seeks to offer a hearsay statement, courts must decide whether the statement is so reliable that the prosecution may safely "deny the accused his usual right to force the declarant to submit to cross-examination, the greatest legal engine ever invented for the discovery of truth." *Lilly v. Virginia*, 527 U.S. 116, 124 (1999) (internal citation omitted) (quoting *California v. Green*, 399 U.S. 149, 158 (1970)). Courts must bear in mind several possibilities:

The declarant might be lying; he might have misperceived the events which he relates; he might have faulty memory; his words might be misunderstood or taken out of context by the listener. And the ways in which these dangers are minimized for in-court statements — the oath, the witness' awareness of the gravity of the proceedings, the jury's ability to observe the witness' demeanor, and, most importantly, the right of the opponent to cross-examine — are generally absent for things said out of court.

*Williamson v. United States*, 512 U.S. 594, 598 (1994). To
this list might be added the danger of law enforcement impri-
matur when testimony from a shaky witness is elicited from
a police officer.

[2] In *Ohio v. Roberts*, 448 U.S. 56 (1980), the Court iden-
tified two situations in which a hearsay statement's "veracity
. . . is sufficiently dependable to allow the untested admission
of such [a] statement[ ] against an accused," *Lilly*, 527 U.S.
at 124. Under *Roberts*, admission of a hearsay statement does
not violate the Confrontation Clause if "the evidence falls
within a firmly rooted hearsay exception," *Roberts*, 448 U.S.
at 66, or if there are other "particularized guarantees of trust-
worthiness such that adversarial testing would be expected to
add little, if anything, to the statements' reliability," *Lilly*, 527
U.S. at 125 (internal quotation marks omitted) (quoting *Rob-
erts*, 448 U.S. at 66). The "firmly rooted" hearsay exception
is "designed to allow the introduction of statements falling
within a category of hearsay whose conditions have proved
over time to remove all temptation to falsehood, and to
enforce as strict an adherence to the truth as would the obliga-
tion of an oath and cross-examination at trial." *Lilly*, 527 U.S.
at 126 (internal quotation marks omitted).

[3] The Supreme Court has held that hearsay statements
characterized as "excited utterances" or "spontaneous declara-
tions" are "firmly rooted" exceptions to hearsay. *See Idaho v.
Wright*, 497 U.S. 805, 820 (1990); *White v. Illinois*, 502 U.S.
346, 355-56 (1992). The reasoning for the exception is that
such statements are "given under circumstances that eliminate
the possibility of fabrication, coaching, or confabulation," so
that "the circumstances surrounding the making of the state-
ment provide sufficient assurance that the statement is trust-
worthy and that cross-examination would be superfluous."
*Wright*, 497 U.S. at 820.[2] Again, in *White*, the Court described

---

[2]The *Wright* Court cited two treatises and an advisory committee note
to the Federal Rules of Evidence — not Idaho state law — as support for

a spontaneous statement as one "that has been offered in a moment of excitement — without the opportunity to reflect on the consequences of one's exclamation." 502 U.S. at 356. In other words, a statement made *after* the declarant has had an opportunity to reflect or discuss the matter with others does not carry "the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements." *Wright*, 497 U.S. at 817.

## C. Effect of the California Courts' Finding Parrish's Statement Spontaneous

In Winzer's case, the California courts found that Parrish's report of his threat was admissible as a "spontaneous statement," *see* Cal. Evid. Code § 1240, and so did not violate Winzer's rights under the Confrontation Clause.

[4] Of course, Winzer could not obtain federal habeas relief on the grounds that the California courts wrongly found that his statement fit within California's spontaneous statement exception to hearsay. State court rulings on the admissibility

---

this characterization. *See id.* (citing 6 Wigmore, *Evidence* §§ 1745-1764 (J. Chadbourn rev. 1974) at 251; 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 803(2)[01] (1988); Fed. R. Evid. 803(2) advisory committee's note).

In light of the Supreme Court's recent decision in *Carey v. Musladin*, ___ U.S. ___, 127 S. Ct. 649 (2006), the quoted language in *Wright* might conceivably be dicta. However, in *White*, the Court's characterization of the exception was central to the holding of the case. Because "the evidentiary rationale for permitting hearsay testimony regarding spontaneous declarations . . . is that such out-of-court declarations are made in contexts that provide substantial guarantees of their trustworthiness," the Court held that nothing was to be gained by conditioning the admissibility of such statements on the unavailability of the declarant. *White*, 502 U.S. at 355-56. Without a firm understanding of the nature of that context, the Court would not have been able to conclude that the declarant's availability was immaterial. Thus, for purposes of the Confrontation Clause analysis, what makes a spontaneous declaration an exception to hearsay is the declarant's lack of opportunity to reflect or fabricate.

of evidence generally fall outside the scope of federal habeas relief, which is designed only to remedy violations of federal law. *See* 28 U.S.C. § 2254(a); *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967). The California Supreme Court is the highest authority on the interpretation and application of California law. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions."); *Wisconsin v. Mitchell*, 508 U.S. 476, 483 (1993) ("There is no doubt that we are bound by a state court's construction of a state statute.").

**[5]** But where a Confrontation Clause violation is alleged, federal courts can go beyond a state court's characterization and analyze whether a factual basis supports the state court's decision. In *Paxton v. Ward*, 199 F.3d 1197, 1207-11 (10th Cir. 1999), the Tenth Circuit applied AEDPA and held that the state court made an unreasonable determination of the facts when it found that the statement in question was an excited utterance for purposes of the Confrontation Clause.[3] *Paxton* noted that "[t]he Supreme Court has rejected the argument that a state court determination admitting hearsay under state law is dispositive of a petitioner's habeas claim that his constitutional confrontation rights were violated by the admission." 199 F.3d at 1208 (citing *Lee v. Illinois*, 476 U.S. 530, 539 (1986)).[4] Further, *Paxton* relied on the *Lee* decision not

---

[3]*Paxton* was followed in *Woodward v. Williams*, 263 F.3d 1135 (10th Cir. 2001) (holding that state court "correctly found that Deborah's statements to Butler and Maggart fall within the excited-utterance exception").

[4]The *Paxton* court was referring to the *Lee* Court's characterization of the issue before it:

> Illinois . . . correctly recognizes that the admissibility of the evidence as a matter of state law is not the issue in this case; rather, it properly identifies the question presented to be "whether that substantive use of the hearsay confession denied Petitioner rights guaranteed her under the Confrontation Clause. . . ." It contends, in essence, that Lee's Sixth Amendment rights were not violated

merely to say that hearsay falling under the second prong of *Roberts* must be supported by particularized guarantees of trustworthiness, but to say that a federal habeas court must consider whether a hearsay statement *actually does* fall within a firmly rooted exception under the *first* prong of *Roberts* — even if the state court has already determined that it does.

**[6]** The question here does not end with the California courts' determination that Parrish's report to Dickson was "spontaneous." The issue falls under the Confrontation Clause: did the admission of Winzer's threat to Parrish through Dickson's testimony violate Winzer's right to confront Parrish?[5] If the circumstances surrounding Parrish's report of the statement to Dickson fit the Supreme Court's descriptions of the excited utterance or spontaneous declaration exception to hearsay, as set forth in *Wright* and *White*, then the Confrontation Clause was not violated. If the circumstances do not fit those characterizations, then admission of the statement violated the Confrontation Clause. Once content is imputed to the category of spontaneous statements, it becomes impossible to rely exclusively on the label the state courts attach to the statement in question.

In sum, even under AEDPA, we cannot avoid the question of whether a hearsay statement falls within a firmly rooted

---

because Thomas was unavailable and his statement was "reliable" enough to warrant its untested admission into evidence against Lee. *See Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 596 (1980).

*Lee*, 476 U.S. at 539 (internal citation to record omitted) (second omission in original).

[5]Thus, even if a state recognized *no* "spontaneous statement" or "excited utterance" exception to hearsay, a defendant against whom such a statement was admitted would have no claim for federal habeas relief if the statement was made with no opportunity to fabricate. *See* 28 U.S.C. § 2254(a) (authorizing federal courts to grant habeas relief only for violations of federal law).

exception to hearsay and so complies with the Confrontation Clause.

## D. Reasonableness of the State Courts' Application of Clearly Established Federal Law

[7] As we must on AEDPA review, we presume that the state courts' factual findings are correct. The trial court found that Parrish's statement to Dickson was spontaneous because she was "visibly upset, emotionally upset, almost to the point of shaking, [and] fearful" as she spoke. On this basis, the trial court made a finding that Dickson's testimony as to her statements could be introduced because there were sufficient indicia of reliability so that confrontation was unnecessary.[6] Other than Parrish's demeanor, as reported by Dickson, the state court recites, and the record contains, no evidence as to the reliability of Parrish's statement.

[8] The mere fact that Parrish was upset as she spoke would not make her utterance reliable. As the Supreme Court has recognized, a spontaneous statement is reliable because it is offered "without the opportunity to reflect on the consequences of one's exclamation." *White*, 502 U.S. at 356. Just because a subject is or appears to be *upset* offers no guarantee that he has not taken time to consider the matter. The subject may be upset precisely because he's had time to reflect, or he may feign emotional distress in a calculated effort to appear more credible.

The state appeals court explained that the statement was spontaneous because "the declarants relived the experience and recounted it unreflectively while under the stress of the

---

[6]According to the transcript, the state trial judge stated that "there is sufficient issue of liability for the admission of the statements." The words "issue of liability" make no sense in this context; we assume that the transcript must have meant "indicia of reliability," and construe the trial court's statement as a factual finding owed deference under AEDPA.

original exciting event." But the circumstances that leap from the record before this Court do nothing to preclude, or even diminish, the possibility of confabulation or coaching. Parrish told Dickson about something that happened more than five and a half hours earlier. The trial court determined that her intervening 911 call was *not* a spontaneous response to an exciting event and, in fact, that the "bulk" of her call did not concern Winzer's threat at all.

**[9]** The fact that Parrish made a "calm" call to 911 several hours after the exciting event[7] demonstrates that not only did she have the opportunity to reflect on the matter, she *did* so reflect. If Parrish was able to calmly and coolly call 911 several hours after the threat and discuss both the threat and other circumstances, she must have weighed the costs of intrusion against the benefit of obtaining help from the police.

**[10]** Under these circumstances, Parrish's *later* statement to Dickson was not made under "conditions [that] have proved over time to remove all temptation to falsehood and to enforce as strict an adherence to the truth as would the obligation of an oath and cross-examination at a trial," *Lilly*, 527 U.S. at 126 (internal quotations omitted), or "in a moment of excitement — without the opportunity to reflect on the consequences of one's exclamation," *White*, 502 U.S. at 356. Parrish had hours to reflect, to forget, to embellish, to be distracted, and to talk with her daughter, her mother, and perhaps

---

[7]There was no evidence presented to the jury and none is in the record before this Court as to when the 911 call was placed. However, at trial the parties seemed to agree that the call was placed closer to the time of the officers' arrival than to the time of Winzer's departure from Parrish's apartment. The prosecutor conceded that "I am not trying to say that they called the police immediately, I admit that to you." The prosecutor, in closing argument, said there was no evidence as to when the call was made but argued "I hear all the time that the police, takes them forever to get here . . . [T]hey could have made [the call] an hour earlier." Additionally, of course, the trial court found that the "bulk" of the 911 call did not concern the threat.

others before Dickson arrived. She had time and the mental calmness, as the state court decided about the 911 call, to choose what stance to take with the officers when they arrived — whether to be calm and composed or excited and histrionic. The state court thus failed to apply the standard for reliability set forth by the Supreme Court. *See White*, 502 U.S. at 356. As such, in finding that Parrish's report to Dickson was a spontaneous declaration or excited utterance, the California courts unreasonably applied federal law. No other exception appearing, and with no other particularized guarantee of the truthfulness of Parrish's statement, its admission against Winzer violated the Confrontation Clause. The Sixth Amendment does not permit the "he said she said he said" litany that convicted Winzer in this case.

## E.  Prejudice

Violation of the Confrontation Clause is trial error subject to harmless-error analysis, *see Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986), because its effect can be "quantitatively assessed in the context of other evidence presented" to the jury, *Arizona v. Fulminante*, 499 U.S. 279, 308 (1991). If the error did not result in "actual prejudice," the writ should not issue. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993) (adopting standard of *Kotteakos v. United States*, 328 U.S. 750 (1946)). "Actual prejudice" is demonstrated if the error in question had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 623; *Fry v. Pliler*, ___ U.S. ___, ___, 127 S. Ct. 2321, 2327 (2007); *Bains v. Cambra*, 204 F.3d 964, 977-78 (9th Cir. 2000).

Parrish's statement about what Winzer said as admitted through Dickson was not the only evidence against Winzer. Mercedes told Dickson that she overheard Winzer say, "I'll smoke you and your daughter." Mercedes testified at trial that she did not recall Winzer saying that, but she remembered many other details of the incident,[8] and it would have been

---

[8]The complete trial transcript is not in this Court's record.

reasonable for the jury to find that she claimed not to remember because she was unwilling to give testimony, whether true or false, that could convict Winzer. Winzer returned to Parrish's home a few days after the first incident, and the jury could have reasoned by inference that he was responsible for causing the damage to her home. When he went to Parrish's home, Winzer was violating a protective order. There was overwhelming evidence that Winzer and Parrish had a violent relationship.

But Winzer's potential violence could not have sufficed to convict him under section 422. Parrish was the central witness in the case. She reportedly heard the threat that is the basis of Winzer's conviction. Yet she did not testify and the proof came in by hearsay within hearsay. If she had taken the stand and testified that Dickson misunderstood her or put words in her mouth, or simply denied altogether that Winzer made any threat, he might have been acquitted.

At the same time, the evidentiary picture presented to the jury was materially distorted by the Confrontation Clause violation. Winzer was convicted of making a terrorist threat. The trial court instructed the jury that it must find beyond a reasonable doubt that:

> 4. The threatening statement on its face, and under the circumstances in which it was made, was so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat; and

> 5. The threatening statement caused the person threatened reasonably to be in sustained fear for her own safety or for her family's safety.

*See* Cal. Jury Instr. Crim. 9.94 (2002).

Dickson's testimony that Parrish said Winzer gestured toward a shiny object in the waistband of his pants was forceful evidence of "a gravity of purpose and an immediate prospect of execution of the threat," and Winzer had no opportunity at all to cross-examine Parrish on that point.

Only two witnesses testified that Winzer made any threat. Dickson — a police officer, who could command the jury's respect — testified that Parrish told him Winzer had made a threat. The only other witness who testified that Winzer made a threat was Parrish's mother — a witness who personally accosted Winzer and referred to him as "a son of a bitch" in front of the jury, even after being admonished by the judge. Assuming the jury believed Parrish's mother, a somewhat dubious prospect, she did not testify that Winzer made a motion toward a potential weapon at his waistband. Without testimony as to that motion, there was no proof that Winzer intended Parrish to fear for her safety.

Dickson only had Parrish's report of what she said Winzer did. The trial court excluded the 911 call on the grounds that Parrish was not sufficiently fearful at the time she made it. Not only was Parrish "one of the calmest" 911 callers the judge had ever heard, but "the bulk of the tape" apparently had nothing to do with Winzer's reported threat. The jury was not permitted to hear and weigh that evidence for itself.

**[11]** By contrast, Dickson's description of Parrish's and Mercedes's demeanor and fear gave the impression that the *only* reason Parrish called the police was that she and Mercedes feared Winzer would act on his threat and, further, that they were *still* upset, shaking, and fearful more than five and a half hours after Winzer left, even though the trial court knew that was not the case because the 911 call was "one of the calmest" it had ever heard. The erroneous impression created for the jury was the inevitable result of the trial court's misapplication of the spontaneous declaration exception to hearsay. The court's rulings stacked the deck.

**[12]** Significantly, because all the evidence before the jury tended to show that Parrish was deeply afraid, defense counsel had only the weakest means of dispelling the impression that she was absent from trial because she was afraid of Winzer. She might, instead, have been afraid of testifying under oath. She might have dreaded making a choice between telling the truth at trial and being accused of filing a false police report, on the one hand, or committing perjury on the witness stand and risking prosecution if the jury believed Mercedes when she refused to support Parrish's report to Dickson. Defense counsel could say these things, but the distorted evidentiary picture and common sense suggested otherwise.

Domestic violence cases are exceedingly difficult — and important — to prosecute. But the evidence in this case is equivocal at best about the nature of the threat. While it is understandable that a victim of domestic violence might not report an incident or might retract a previous report of domestic violence, it is less understandable that a victim of domestic violence would wait several hours to report a genuine threat, then report it in "one of the calmest 911 calls" in the trial court's experience — and in a call that primarily concerned other matters. Maybe Winzer made the threat and meant it, but all of the evidence produced at trial is also consistent with a finding that he did not make it, or he did not mean it.

**[13]** Only cross-examination of Parrish could flesh out the testimony, and that was precluded by the trial court's rulings. Under such circumstances, it is especially important to toe the constitutional line. Instead, the prosecutor took full advantage of Winzer's unconstitutional dilemma by converting Parrish's absence into substantive evidence of her fear of Winzer.[9] She argued in closing:

---

[9]The prosecutor also emphasized the centrality of Dickson's report of Parrish's statement:

> First of all I just want to go through the elements. Basically when [defense counsel] went through the elements and said that the ele-

Now, I also want to bring up this whole issue about the victim not being here on the stand, it is not like that is not done all the time, it is not like it is unconstitutional. Believe me, if we dismissed or didn't go forward on every case where someone didn't come to court, we would never get convictions, and what message, you talk about the message we would be sending to the victim, what message would it be sending to people who commit crimes? Hey, if you scare them or get rid of them, no case. It is legal, it is fair, it is just that we are going forward without a victim because there are other things to corroborate what happened, there are other things besides her getting up here.

And counsel tells you, well, if she got up here you would easily be able to tell that she was lying, so that infers [sic] that he is saying you can easily tell when someone is lying about being scared. And then he also tells you that Officer Dickson seems like a really fair, reasonable guy. Well, he was there that day so if [s]he was lying he would easily be able to tell that she was lying. He said he saw her and he said that she was scared. I don't know, maybe you have secret powers that Officer Dickson doesn't have but Officer Dickson believed them. . . .

And domestic violence cases are a little different than most cases, for instance, it is not unusual to not hear from the victim, and I will be the first to tell you that I wished that Parrish Harvey walked

_____

ments weren't made, his premise for every element that wasn't made was that the threat wasn't made, so what I want to say to you is that if you believe that that threat was made, "if you leave me I will smoke you," then all of the elements of 422 have been met because it is clearly the type of threat that we are talking about.

through that door and got on the stand and told you what happened to her on December 2nd, but some things are beyond my control, and I am sure that the defendant wished that we just didn't go forward with our case, but that didn't happen because this case is not about Parrish Harvey versus the defendant, this case is about the People of the State of California versus the defendant, and that is why I am here and that is why you are here.

**[14]** Parrish's hearsay report to Officer Dickson was why Winzer was there. He was entitled to cross-examine her. Her absence had a substantial and injurious influence on the jury's verdict. Habeas relief is required.

The District Court is REVERSED and the case is REMANDED with instructions to issue the writ and require the state court either to grant a new trial or to dismiss the charge of making a terrorist threat.