Filed 2/2/16  P. v. Austin CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>FRANK AUSTIN,<br><br>      Defendant and Appellant. | A138540<br><br>(Alameda County<br>Super. Ct. No. 168662) |

A jury convicted defendant Frank Austin of the second degree murder of his girlfriend Vernita Jones, and found true an allegation that he used a deadly weapon, a knife.  The trial court sentenced Austin to 16 years to life in prison.

On appeal, Austin argues (1) the prosecutor committed prejudicial misconduct by misstating the legal standard governing the lesser included offense of voluntary manslaughter, and (2) the court erred by admitting evidence that, a few months before the homicide, Jones told a neighbor of Austin's that Austin had beaten her up.  Austin also contends, and the Attorney General agrees, that a domestic violence fee must be stricken and a criminal conviction assessment fee must be reduced.

We reject Austin's arguments except that we agree with the parties that the domestic violence fee must be stricken and the criminal conviction assessment fee must be reduced.  As modified, the judgment is affirmed.

1

# I. BACKGROUND

## A. Evidence at Trial

### 1. The Prosecution's Case

Majuan Franklin was Jones's cousin. Franklin testified that, in March 2011, he and Jones stopped by Austin's residence, a room in the Avondale Hotel in Oakland. Jones did not have a permanent home at the time, and she often stayed at Franklin's house. When they visited Austin, he smelled of alcohol and appeared to be high on crack cocaine. After about an hour, Jones and Franklin left. As they walked along Telegraph Avenue, Austin rode up to them on his bicycle. Austin looked angry, and he threw his bicycle onto the ground. Austin said, " 'Where you think you are going, woman?' " Jones responded " 'I'm going with my cousin.' " Austin grabbed Jones and pressed her against a telephone pole. Jones tried to squirm away. Franklin told Austin to let his cousin go. Franklin then nudged Austin with his arm. Austin lifted his shirt, revealing a pocket knife clipped to his waistband. Austin patted his waistband and said " 'You don't want none of this.' " Jones looked frightened and told Franklin to leave. Franklin left and took the bus to meet friends. Franklin was concerned about Jones's welfare and spoke to her about her relationship with Austin.

Cloretta Starks resides at the Avondale Hotel in Oakland. Starks knew Austin from the hotel. Starks met Jones and was on good terms with her. As we discuss further below, Starks testified that, a few months before Jones's death, Jones came to Starks's apartment. Jones had black-and-blue circles around her eyes, and her face was swollen. Jones was crying. Jones stated that Austin had beaten her up.

Gregory Nichols lives on the third floor of the Avondale Hotel. In July 2011, Nichols knew Austin and his girlfriend Jones. A few days before Jones's death, Austin knocked on Nichols's door; when Nichols opened the door and came out of his room, Austin asked Nichols if he had been "messing around" with Jones. Austin appeared to be angry. Nichols denied the accusation. Austin told Jones to come to the door and asked her whether Nichols had been "messing around" with her. Jones said, " 'Yeah.' " Nichols believed Jones agreed because she was scared.

Gerald Yee lived at the Avondale Hotel in room 24. Austin lived next door to him. Yee knew Jones, who was Austin's girlfriend. Austin accused Yee of "going with" Jones. On the afternoon of July 3, 2011, in the hotel hallway, Austin argued with Yee about Jones. Austin was angry. Yee told Austin he had nothing to do with Jones. After this confrontation, Yee, who had returned to his room, heard noises coming from Austin's room. Yee was watching television at a low volume. He recognized Jones's and Austin's voices; they were arguing. He heard Austin say, " 'I got to end it.' " A woman was screaming and saying, " 'Help me.' " Yee heard pounding on the walls.

Video taken by a hotel security camera shows Austin arguing with Yee and Nichols in the hallway on the afternoon of July 3, 2011; there is no sound on the video.

Shanice Jones, Vernita Jones's daughter, was raised by adoptive parents. Jones visited Shanice in Stockton. On July 4, 2011, at about 11:00 a.m., Shanice spoke with Jones by telephone. They spoke for a few minutes about a baby shower for Shanice. The phone Shanice used belonged to her friend's brother. Later that day, the friend's brother told Shanice that he had received two calls on his phone from a number in the 510 area code that Shanice recognized as Austin's phone number. Shanice tried calling back several times, but there was no answer.

Austin made a 911 call on July 6, 2011, at approximately 9:40 a.m., and stated his girlfriend had been dead for two days.

When police arrived after the 911 call on July 6, 2011, Jones's body was on the bed in room 23 of the hotel. Austin was upset and was trying to embrace Jones. The police took a statement from Austin.

There was a significant amount of blood on and around the bed. There was blood all over the room, including on the ceiling, most of the walls, a chair and a bicycle tire. A bloody handprint was on the wall. A knife in the knife block had red-brown staining. Jones's body had an insect infestation, indicating that her death was not recent.

Criminalist Allan Dixon, an expert in DNA analysis, examined five knives taken from a knife block in the room. The largest knife had a blood stain on the handle.

Jones's DNA matched the DNA of this blood. The second-largest knife had blood stains on it. Several of these stains matched Jones's DNA.

The police reviewed video of the hallway taken by the security camera outside the door of Austin's room during the period from about June 30, 2011, until the time the police arrived on July 6, 2011. Jones did not appear on the video after July 3, 2011.

On July 7, 2011, forensic pathologist Dr. John Iocco examined Jones's body. He concluded she died from multiple contusions, abrasions, and incised wounds. Jones had a fractured wrist and two fractured ribs. She had collapsed lungs caused by blunt force injury to her chest. An incised wound is made with a sharp edge; the length of the wound exceeds its depth. Jones had 66 incised wounds to various parts of her body, including her face, chest, abdomen, both arms and her left leg. She also had multiple contusions or bruises. There were contusions on 80 percent of Jones's face; her right eye was swollen, and her left eye had contusions. The injury to the right eye is consistent with being punched. There were red contusions on Jones's chest. There were contusions covering 50 percent of each of her legs, especially her feet and knees; these injuries were consistent with her being kicked, stomped or hit with a blunt object. There were contusions covering significant portions of both of Jones's arms and her back. The injuries to her back were consistent with being kicked, stomped, punched, or thrown into hard objects. Abrasions on her back were consistent with being dragged across a carpet.

The time of Jones's death was uncertain. Dr. Iocco estimated it would take "a matter of hours," or "as much as a day or two," for a person to die from the wounds suffered by Jones. If Jones had received medical treatment soon after sustaining the injuries, her chances for survival would have improved. Dr. Iocco testified that the presence of maggots on Jones's skin (as shown in a photograph taken sometime after 10:00 p.m. on the evening of July 6, 2011) showed she probably had been dead at least 24 hours by that time. The presence of maggots "generally takes a day plus," so Dr. Iocco believed Jones had died "at least 24 hours before, maybe 36 hours before" the photograph was taken.

4

On the evening of July 6, 2011, a Highland Hospital emergency room physician examined Austin, who was calm and subdued. Austin complained of hand pain. Both of his hands were swollen. An X-ray showed Austin had a fracture in the second metacarpal bone on his right hand. The examining physician estimated this injury occurred within the four to five days preceding the examination. Austin also had two abrasions on his right bicep region.

## 2. The Defense Case

Austin presented the testimony of four Oakland police officers about their arrests of Jones in 2008 and 2010 for domestic violence against Austin and related charges. Officer Donald Lane testified that, on November 2, 2008, he contacted Austin and Jones on a domestic violence call. Jones appeared to be intoxicated. Officer Lane arrested Jones.

On November 16, 2008, Oakland police officer Tim De La Vega contacted Austin and Jones, in response to Austin's complaint that Jones had violated a restraining order. After verifying the validity of the restraining order, Officer De La Vega arrested Jones.

On November 30, 2008, Oakland police officer Wenceslao Garcia spoke with Austin and Jones. He arrested Jones for domestic battery and violation of a restraining order.

On August 19, 2010, Oakland police officer Keith Souza spoke with Austin and Jones based on a report of a battery. He arrested Jones for domestic battery and public intoxication.

## B. The Charges, Verdict and Sentence

An information charged Austin with the murder of Jones (Pen. Code,[1] § 187, subd. (a)). The information alleged Austin used a deadly weapon, a knife (§ 12022, subd. (b)(1)), and had three prior felony convictions and a prior prison term (§ 667.5, subd. (b)). The jury acquitted Austin of first degree murder, but convicted him of second degree murder and found he used a knife. The court sentenced Austin to 15 years to life

---

[1] All statutory references are to the Penal Code unless otherwise stated.

in prison for murder, plus one year for the weapon use enhancement, for a total term of 16 years to life.  Austin appealed.

## II.  DISCUSSION

### A.  Prosecutorial Misconduct

Austin contends the prosecutor committed misconduct by misstating the law of voluntary manslaughter during closing argument.  Austin asserts the prosecutor improperly defined provocation for purposes of heat of passion voluntary manslaughter and lowered the prosecution's burden of proof.

#### 1.  Additional Background

In her closing argument, the prosecutor argued the evidence established Austin was guilty of murder rather than heat of passion voluntary manslaughter.  The prosecutor stated that, for provocation to reduce murder to voluntary manslaughter, the provocation must be of the type that "excites and arouses the passion," and a defendant must have "acted while he was under that influence, that excitement and that arousal of passion." The prosecutor further explained that, in evaluating whether provocation reduced murder to manslaughter, the jury was to apply "an ordinary person standard in the same situation," and a defendant may not "set his own standard of conduct."  The prosecutor then stated that the argument in the hallway on the afternoon of July 3 about Jones's alleged involvement with Nichols and Yee did not "rise to a level of a provocative act." In support of her position, the prosecutor stated Nichols had testified Austin was "a little agitated," but Nichols did not say Austin "was incensed or blowing smoke out of his head."  The prosecutor then gave an example that Austin challenges on appeal as improper (although defense counsel did not object to it at trial):

"When a person, a normal person under these conditions, having found out that their wife, girlfriend, boyfriend, partner, has been perhaps cheating on them, what does a normal, reasonable person do?  Well, maybe they decide to break up.  Maybe they try to get counseling.  Maybe [they] go on Match dot com.  Maybe they go shopping.  Maybe they get together with friends to vent.  Maybe they even go on the Jerry Springer show to vent.  But they do not kill their intimate partners.  They do not kill."

6

The prosecutor concluded by stating the hallway incident did not constitute provocation. It showed Austin "is an angry and jealous and controlling man," but (under the ordinary person standard for provocation) "he is not allowed to act on that." Finally, the prosecutor (noting the testimony of Shanice Jones that she spoke to her mother on the morning of July 4) argued the hallway incident on the afternoon of July 3 could not constitute sufficient provocation because Austin had ample time to "cool off" after that argument and before he killed Jones.

In his closing argument, Austin's counsel contended Austin acted upon a sudden quarrel or heat of passion. Defense counsel argued Austin was provoked and, "[a]s a result of the provocation, [he] acted rashly and under the influence of intense emotion that obscured his reasoning or judgment." Defense counsel noted provocation is sufficient if it "would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

Defense counsel then responded to the prosecutor's argument that the hallway incident did not constitute sufficient provocation. Counsel stated: "[The prosecutor] argues that this isn't sufficient provocation, but this is classic provocation. Classic provocation. [¶] Man comes home, finds his wife in bed with another woman [sic]. Kills her. Woman goes to school, sees her husband with another woman, runs him over. Heat of passion. [¶] It's classic. You might not do it, I might not do it, but that doesn't mean that a reasonable person wouldn't do it. [¶] In fact, the entire history of mankind tells you otherwise. Passion is a feeling, and nothing arouses passion more than the feelings for another person, whether they be love, or whether they be hatred, whether it be jealousy, and nothing is going to raise a passion more in a person than the feeling of betrayal and of infidelity."

In rebuttal, the prosecutor responded to the defense argument about the hallway incident. The prosecutor stated (in the second portion of her argument that Austin contends was improper): "The defense claims that she in the hallway is somehow taunting him. Even if you believe that she was in some fashion taunting him—and I think it would be speculative to say that from this video that we can conclude she is

7

taunting him—but even if you believe that, this does not constitute provocation under the law for the way that the defendant subsequently beat her, and beat her in a very savage fashion. This is not the kind of provocation that the law provides." Defense counsel objected to this argument as a misstatement of the law. The court stated that it would instruct the jury on the law, and that the jury would be bound by the law as given in the court's instructions.

### 2. Analysis

Austin contends that the prosecutor, in the two portions of her argument noted above, misstated the law of provocation for purposes of heat of passion voluntary manslaughter, by focusing on whether the asserted provocation (the hallway argument) would cause the average person to act as Austin did (i.e., by killing), rather than on whether the provocation would cause the average person to react rashly. In *People v. Beltran* (2013) 56 Cal.4th 935, 938 (*Beltran*), on which Austin relies, the Supreme Court clarified the type of provocation that is sufficient to constitute heat of passion and reduce a murder to manslaughter. The court stated: "[P]rovocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Id.* at p. 949.) Adequate provocation for voluntary manslaughter does not require a finding that an ordinary person would kill. (*Ibid.*) The prosecutor's statement to the contrary was incorrect.

In the circumstances of this case, however, we conclude reversal is not required. First, as noted, defense counsel did not object at trial to the prosecutor's statement in the opening portion of her argument that a reasonable person who discovered his or her partner's infidelity would not kill. " '[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Stanley* (2006) 39 Cal.4th 913, 952.) Austin

has forfeited any contention that this portion of the prosecutor's argument constituted misconduct.[2]

Second, because we find no prejudice, we reject (1) Austin's claim of misconduct based on the prosecutor's statement in rebuttal that Jones's alleged taunting of Austin in the hallway (as purportedly illustrated by gestures visible on the hotel security video) did not constitute sufficient provocation, and (2) Austin's contention that defense counsel provided ineffective assistance by failing to object to the prosecutor's earlier statement. As to the prosecutor's alleged misstatement of the law of provocation in rebuttal, the applicable standard of prejudice is set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), i.e., " 'a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' "[3] (*Beltran, supra,* 56 Cal.4th at p. 955 [*Watson* standard applied in determining whether misstatements of provocation standard in closing argument were prejudicial].) As to ineffective assistance, a defendant must show (1) his trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the defendant suffered prejudice, i.e., there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694 (*Strickland*); accord, *People v. Carter* (2003) 30 Cal.4th 1166, 1211 (*Carter*).) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* 466 U.S. at

---

[2] We decline Austin's request that we exercise discretion to consider this forfeited claim on its merits.

[3] Austin argues that the prosecutor's alleged misstatements of the provocation standard, taken together, rose to the level of a due process violation and lowered the prosecution's burden of proof; he argues prejudice should be assessed under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18. Because Austin forfeited any direct claim that the prosecutor's first statement constituted error, and because he does not contend that the prosecutor's somewhat more oblique statement in rebuttal, standing alone, rose to the level of a federal constitutional violation, we do not address this argument. In any event, as noted above and as Austin acknowledges, our Supreme Court held in *Beltran* that the *Watson* standard of prejudice applies in this context. (*Beltran, supra,* 56 Cal.4th at p. 955.)

p. 694; accord, *Carter, supra,* 30 Cal.4th at p. 1211.) "If a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient." (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

We conclude that, even assuming that counsel was deficient for failing to object to the prosecutor's first statement and that the prosecutor's second statement was an inaccurate statement of the law, Austin has not shown prejudice from these alleged errors. It is not reasonably probable that, absent the alleged errors, Austin would have obtained a more favorable verdict. (See *Strickland, supra,* 466 U.S. at p. 694; *Watson, supra,* 46 Cal.2d at p. 836.)

The prosecutor emphasized during her argument that the court would provide the controlling instructions on the law. When defense counsel objected to certain portions of the prosecutor's argument as misstatements of the law (including the prosecutor's statement about provocation in her rebuttal argument), the court told the jurors that it would instruct them on the law and that they were to follow the law as stated by the court. The court and the prosecutor both told the jury that, if anything stated by the attorneys conflicted with the court's instructions, the jury was to follow the court's instructions.

After closing arguments, the court instructed the jury. The court stated (in CALCRIM No. 200): "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." The court delivered standard instructions on homicide, including describing the type of provocation that reduces murder to voluntary manslaughter. In CALCRIM No. 570, the court specified (consistent with the Supreme Court's subsequent opinion in *Beltran*) that, to be sufficient, the provocation "would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." (See *Beltran, supra,* 56 Cal.4th at pp. 938, 949, 954.) The same instruction stated the prosecution had the burden

10

to prove beyond a reasonable doubt that Austin did not kill as the result of a sudden quarrel or in the heat of passion. We presume the jury followed these instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 435–436.)

Austin contends that, despite the court's correct instructions, the prosecutor's statements about provocation were prejudicial. Austin notes that, in *Beltran*, the Supreme Court found the prosecutor's misstatement about provocation to be harmless, in part because in that case the deliberating jury submitted a written question to the trial court about the provocation standard and the court reinstructed the jury on that point. (*Beltran, supra,* 56 Cal.4th at pp. 943, fn. 5, 945, 954, 955–956; see *People v. Najera* (2006) 138 Cal.App.4th 212, 224; cf. *Deck v. Jenkins* (9th Cir. 2014) 768 F.3d 1015, 1020, 1027, 1029–1030 [finding prejudice in part because trial court did not reinstruct in response to mid-deliberation request for clarification].) Here, although the jury submitted written notes about other issues during deliberations, it did not ask or express confusion about the provocation standard, and the court had no occasion to reinstruct the jury on that standard during deliberations. In light of the court's correct instruction on provocation and the court's repeated admonition that the jury follow its instructions rather than any conflicting statements by the attorneys, and in light of the state of the evidence as to provocation (which we discuss below), we are not persuaded that the absence of an additional (and unsolicited) instruction during deliberations establishes prejudice.

Moreover, contrary to Austin's suggestion, the amount of time the jurors spent deliberating and their acquittal as to first degree murder do not support a conclusion that the prosecutor's statements about when provocation reduces murder to manslaughter were prejudicial. After hearing closing arguments and the court's instructions on "day 11" of the trial, the jury deliberated for about one hour that afternoon and then for most of "day 12." At about 3:30 p.m. on day 12, the jury submitted its second note to the court,[4]

---

[4] The jury's first note (which was submitted to the court on the morning of day 12) included questions about which portions of the hotel surveillance video were included in evidence.

which stated: "We cannot agree unanimously on 1st degree murder. We have reached a unanimous decision on another count. [¶] Please advise on how we should proceed." The court, after discussing the note with counsel, reinstructed the jury about deliberation and completion of verdict forms for the homicide offenses under consideration (first and second degree murder and voluntary and involuntary manslaughter). The jury retired to resume deliberations just before 4:00 p.m. and returned with a guilty verdict on second degree murder at about 4:30 p.m. If any inference can be gleaned from this timeline (including the jury's note about first degree murder and its prompt verdict on second degree murder after the court responded to that note), it is that the jury found it a close question whether the evidence showed beyond a reasonable doubt that Austin's crime was first degree (rather than second degree) murder. This record does not suggest that the jury found close or difficult the question whether Austin killed Jones in a heat of passion that reduced the killing from murder to voluntary manslaughter.

Finally, the trial evidence as to provocation and heat of passion was not as strong as Austin suggests, and does not support a finding that the prosecutor's remarks on this point were prejudicial. The testimony of Nichols and Yee and the surveillance video support Austin's appellate argument that he was angry when he confronted them on the afternoon of July 3 about whether they had been involved with Jones, and Yee later heard Austin and Jones arguing in Austin's room. But we note that the video suggests Austin was already angry before Jones made her allegedly provocative, "taunting" gestures, and the jury might have concluded Austin was angry not because of Jones's conduct, but because, as the prosecutor suggested, he was "an angry and jealous and controlling man." Moreover, it was far from clear that, when Austin inflicted Jones's fatal injuries, he "simply react[ed] from emotion" due to the alleged provocation, "without deliberation or judgment." (*Beltran*, *supra*, 56 Cal.4th at p. 950.) Shanice Jones testified she spoke to her mother by telephone at about 11:00 a.m. on July 4, nearly 24 hours after the hallway argument. This testimony made it less likely that the jury would find Austin attacked Jones shortly after the alleged provocation in the hallway on the afternoon of July 3, and more likely that the jury instead would find Austin committed the crime after he had had

12

time to cool off. Austin notes Dr. Iocco's testimony that Jones might not have died quickly after Austin inflicted her wounds and that she might have lived for hours or for as long as a day or two. But it is not likely the jury drew the inference Austin suggests, i.e., that Austin inflicted Jones's injuries on the afternoon of July 3, and that, late the following morning, Jones (while still alive but badly wounded) conversed with her daughter by telephone. We find no prejudice.

## B. Testimony of Cloretta Starks

### 1. Additional Background

The court held an Evidence Code section 402 hearing outside the presence of the jury to determine the admissibility of Cloretta Starks's testimony. At that hearing, Starks testified that, a few months before Jones's death, Jones came to Starks's room at the Avondale Hotel. Jones had black eyes; her face was swollen; and she looked "beat[en] to a pulp." Jones was upset and crying. When Starks asked her what happened, Jones stated that Austin had beaten her up. Jones did not say when the incident occurred; Starks assumed it was recent because of Jones's appearance. Starks had not seen Austin for a couple of days. Defense counsel elicited on cross-examination that Starks had testified at the preliminary hearing that Jones stated Austin was in jail. Starks assumed the incident had occurred a few days before Jones's visit.

After hearing argument, the court determined Starks's testimony about Jones's statements was admissible under Evidence Code sections 1240 and 1241 (the hearsay exceptions for spontaneous statements and contemporaneous declarations), "under the circumstances of the victim coming to the home of Ms. Starks, still beaten with visible scarring and bruises as described by this witness, and then upset and crying, and sharing with her what had occurred."

At trial, Starks testified about Jones's visit a few months before her death. Jones had black-and-blue circles around her eyes, and her face was swollen. Jones was crying and appeared to have a "broken spirit." In response to Starks's question about what had happened, Jones stated that Austin had beaten her up.

13

## 2.    Analysis

Austin contends the court erred in admitting Starks's testimony about Jones's statement because it was not spontaneous for purposes of admission under Evidence Code section 1240.  We conclude the court properly admitted the testimony under that statute.[5]

Evidence Code section 1240 provides:  "Evidence of a statement is not made inadmissible by the hearsay rule if the statement:  [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."  In deciding whether to admit a statement under this statute, the trial court must determine whether the declarant was still under the stress of excitement when making the statement, and whether he or she was narrating or describing an event personally perceived.  (*People v. Brown* (2003) 31 Cal.4th 518, 540–541.)  We must uphold the court's preliminary determination of these facts if they are supported by substantial evidence (*id.* at p. 541), and we review for abuse of discretion the court's ultimate decision to admit the evidence.  (*People v. Phillips* (2000) 22 Cal.4th 226, 236.)

Austin contends we should engage in de novo review because we need only apply a rule of law to an "undisputed" set of facts.  Austin relies on the concurring opinion in *Miyamoto v. Department of Motor Vehicles* (2009) 176 Cal.App.4th 1210, 1223–1224 (which did not involve Evid. Code, § 1240), in which Justice Rushing discussed the abuse of discretion standard generally and noted a trial court does not have discretion to decide what rule of law to apply.  That opinion, thoughtful exegesis though it may be, does not assist Austin, and we reject his argument that de novo review is appropriate here.  As noted, when a trial court determines that (in light of the passage of time and other relevant circumstances) a statement satisfies the requirement of spontaneity under

---

[5] We therefore do not address the other hearsay exception mentioned by the court, i.e., Evidence Code section 1241, the exception for a declarant's contemporaneous statement about his or her own conduct.

14

Evidence Code section 1240, we uphold that determination if it is supported by substantial evidence. (*People v. Brown, supra,* 31 Cal.4th at pp. 540–541.)

Substantial evidence supports the trial court's determination that, when Jones told Starks that Austin had beaten her up, Jones was still under the stress of excitement from that event. As the court noted, when Jones arrived at Starks's door, Jones's face was still bruised and swollen. It appeared to Starks that Jones was still in pain.[6] Jones was upset and crying.

In arguing Jones's statement was inadmissible, Austin contends principally that too much time had elapsed between the alleged beating and Jones's statement to permit its admission as a spontaneous statement under Evidence Code section 1240. As Austin acknowledges, however, the record does not establish precisely when the alleged beating occurred. Although Starks assumed the incident had occurred a few days before Jones's visit, she did not testify that she knew that, and the court was not required to conclude that a significant amount of time had elapsed between the incident and Jones's statement. In any event, for purposes of admissibility under Evidence Code section 1240, " '[t]he amount of time that passes between a startling event and subsequent declaration is not dispositive, but will be scrutinized, along with other factors, to determine if the speaker's mental state remains excited.' " (*People v. Clark* (2011) 52 Cal.4th 856, 926; see *People v. Raley* (1992) 2 Cal.4th 870, 893–894.) "The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example— may be important, but solely as an indicator of the mental state of the declarant." (*People v. Farmer* (1989) 47 Cal.3d 888, 903–904, disapproved on other grounds by *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.)

---

[6] Austin notes the court did not make an express finding that Jones was in pain. But the court was not required to recite each item of evidence that supported its ruling, or to make express findings of fact in support of that ruling. (See Evid. Code, § 402, subd. (c).)

Here, the evidence as to Jones's mental state supports the trial court's finding that, when Jones told Starks that Austin had beaten her up, Jones was "apparently still under the stress of the event[.]" Jones still had visible injuries, appeared to be in pain, and was upset and crying. (See *People v. Brown, supra,* 31 Cal.4th at pp. 540–541.) The court reasonably could conclude that Jones made her statement to Starks while " 'in the stress of nervous excitement,' " and that her statement was not " 'the product of deliberation.' " (*People v. Saracoglu* (2007) 152 Cal.App.4th 1584, 1588.) The uncertainty as to exactly when the alleged beating occurred did not require the court to reach a contrary conclusion.

We also reject Austin's argument that the court erred by considering the fact that Jones was upset and crying when she made her statement. Austin cites *Winzer v. Hall* (9th Cir. 2007) 494 F.3d 1192, 1200, in which the court stated that the "mere fact" the declarant was upset (when the record contained no other evidence as to the reliability of the declarant's statement) "would not make her utterance reliable." Of course, the circumstances of this case are different, as Jones was not "mere[ly]" upset and crying. She had black eyes; her face was swollen; and she looked "beat[en] to a pulp." In any event, in determining whether a declarant's statement was spontaneous within the meaning of Evidence Code section 1240, a trial court properly may consider evidence that the declarant (whether physically injured or not) seemed to be upset, nervous or scared. (*People v. Ledesma* (2006) 39 Cal.4th 641, 709; *People v. Brown, supra,* 31 Cal.4th at pp. 540–541.) The court did not abuse its discretion in admitting Starks's testimony about Jones's statement.[7]

## C.    The Domestic Violence Fee

At sentencing, the trial court imposed a $4,480 restitution fine pursuant to section 1202.4, subdivision (b). The court also stated it was imposing a "domestic violence fee

---

[7] Because we conclude the court properly admitted the testimony under Evidence Code section 1240, we reject Austin's argument that the alleged error rose to the level of a federal due process violation, and we need not address his contention that the alleged error was prejudicial.

pursuant to Penal Code section 1202.4(b) and 1203.097 in the amount of $500." The minute order refers to the imposition of a "Domestic Violence Fine of $500" pursuant to section 273.5, subdivision (a).

We agree with the parties that imposition of this $500 fee was not authorized in this case. Section 1203.097, subdivision (a) provides that "*[i]f a person is granted probation* for" a domestic violence offense, "the terms of probation shall include all of the following: [¶] . . . [¶] (5)(A) A minimum payment by the defendant of a fee of five hundred dollars ($500) . . . ." (Italics added.) As the parties note, since Austin was not granted probation (but was instead sentenced to state prison), section 1203.097 does not authorize the imposition of the fee specified in that statute.[8] We will strike the $500 domestic violence fee.

## D.     The Criminal Conviction Assessment Fee

Government Code section 70373, subdivision (a) requires the imposition of a $30 assessment for each felony criminal conviction "[t]o ensure and maintain adequate funding for court facilities . . . ." The trial court imposed a $60 assessment for Austin. As the parties note, since Austin was convicted of a single count of murder, the correct amount of this assessment was $30. We will reduce the fee accordingly.

## III.  DISPOSITION

The judgment is modified to strike the $500 domestic violence fee and to reduce the criminal conviction assessment fee (Gov. Code, § 70373) to $30. As modified, the judgment is affirmed. The trial court is directed to (1) prepare an amended abstract of

---

[8] As to the other statutes cited in connection with the domestic violence fee, section 1202.4 (which the court mentioned when it orally imposed the fee) governs restitution fines and does not authorize the imposition of this fee. (As noted, the court separately imposed a restitution fine pursuant to section 1202.4.) Section 273.5 (cited in the minute order) provides in subdivision (g) that "[i]f probation is granted to any person convicted under" section 273.5, subdivision (a) (infliction of corporal injury on specified persons), the court "shall impose probation consistent with the provisions of Section 1203.097 [i.e., including the domestic violence fee specified in that statute]." (§ 273.5, subd. (g).) Austin was not granted probation for a conviction of inflicting corporal injury under section 273.5; he was sentenced to state prison for murder.

17

judgment to reflect the striking of the domestic violence fee and the reduction of the criminal conviction assessment fee, and (2) forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.


_____

Streeter, J.


We concur:


_____

Ruvolo, P.J.


_____

Rivera, J.